# "Grooming" and Seduction of Child Victims of Sexual Exploitation by Acquaintance Molesters

## Kenneth V. Lanning

(Retired FBI Agent)
CAC Consultants
Fredericksburg, VA

REPRINT

Adapted from following publications by Kenneth V. Lanning:

**Child Molesters: A Behavioral Analysis** (4th ed.) National Center for Missing & Exploited Children (2001)

**"Acquaintance Child Molester"** in Medical, Legal, & Social Science Aspects of Child Sexual Exploitation G.W. Medical Publishing, Inc. St. Louis, Missouri (2005)

**"Acquaintance Molesters: Issues in Identification and Prevention"** in Preventing Sexual Violence (Submitted) (2009)

**OVERVIEW**

In order to understand and investigate allegations of what constitutes "acquaintance" molestation, it is important to have a historical perspective of society's general attitudes about the sexual victimization of children. A brief synopsis of these attitudes in the United States is provided here in order to give a context to this discussion. That context, hopefully, will help investigators better understand some of the problems and investigative difficulties encountered in these cases.

In the United States, society's historical attitude about the sexual victimization of children can generally be summed up in one word: **denial**. Most people do not want to hear about it and would prefer to pretend that such victimization just does not occur. Today, however, it is difficult to pretend that it does not happen. Media stories and reports about child sexual abuse and exploitation are daily occurrences. Investigators dealing with sexual victimization of children must still recognize and learn to address this denial. They must try to overcome it and encourage society to address, report, and prevent the sexual victimization of children. They must attempt to do so, however, without misrepresenting or exaggerating the problem.

A complex problem such as the sexual victimization of children can be viewed from three major perspectives: *personal*, *political*, and *professional*. The **personal** perspective encompasses the emotional – how the issues affect individual needs and wants. The **political** perspective encompasses the practical – how the issues affect getting elected, obtaining funding or pay, and attaining status and power. The **professional** perspective encompasses the rational and objective – how the issues affect sexually victimized children and what is in their best interest. Often these perspectives overlap or are applied in combination. Because most of us use all three, sometimes which perspective is in control may not be clear.

Unfortunately, the *personal* and *political* perspectives tend to dominate emotional issues like the sexual victimization of children. The *personal* and *political* perspectives are reality and will never go away. In fact many positive things can and have been achieved through them (*e.g.*, attention, adequate funding, equipment, manpower, quick passage of legislation). One of the biggest obstacles to clear understanding of the sexual exploitation of children by acquaintances is the need of so many to view it from their political or emotional perspective. In general, however, sexually victimized children need more people addressing their needs from the *professional* perspective and fewer from the *personal* and *political* perspectives.

In their zeal to overcome denial or influence opinion, some individuals allow the personal or political perspectives to dominate by exaggerating or misrepresenting the problem. Presentations and literature with poorly documented or misleading claims about one in three children being sexually molested, organized child slavery rings, 50,000 stranger-abducted children, multi-billion dollar profits from child pornography, and victims of child pornography getting younger and the activity portrayed getting more violent or perverted are still common. The documented facts in the United States are bad enough and need no embellishment. True professionals, when communicating about the problem, should clearly define their terms and then consistently use those definitions unless indicating otherwise. Professionals should understand and cite reputable and scientific studies, noting the sources of information. They

should never rely for any significant purposes on one of the most unreliable sources of information – the mass media.  Operational definitions for terms (*e.g.*, *child*, *pedophile*, *predator*, *pornography* and *sexual exploitation*) used in cited research should be clearly expressed and not mixed to distort the findings.  Once someone is caught using distorted or misleading information and labeled an extremist, people may not listen to what he or she says no matter how brilliant or profound.  When the exaggerations and distortions are discovered, the credibility of those people and the issue are diminished.  In addition, accused and convicted offenders use their failure and the failure of their alleged victims to meet these exaggerated expectations as evidence that they are not guilty or are less significant offenders (*i.e.,* not fitting the "profile" or not in the "heartland" of offenders).

### Acquaintance Child Molestation

Today, for many child advocates and professionals in the field, especially social workers, the sexual victimization of children still means one-on-one intrafamilial sexual abuse.  Although they are certainly aware of other forms of sexual victimization of children, when discussing the problem in general their "default setting" (*i.e.,* that which is assumed without an active change) always seems to go back to children molested by family members.  For the public the "default setting" still seems to be stranger abduction.  To them child molesters are sick perverts or predators who physically overpower children and violently force them into sexual activity.

The often forgotten piece in the puzzle of the sexual victimization of children is acquaintance molestation.  A few insightful professionals have recognized the problem of acquaintance child molesters for a long time.  For example, the Boys' Club handbook published in 1939 discussed the behavior patterns of such men trying to gain access to boys through youth-serving organizations (Atkinson, 1939).  Between 1975 and 1985, American law enforcement began to increasingly become aware of these offenders and the investigative challenges they present.  In 1977, the Los Angeles Police Department established a specialized unit (Sexually Exploited Child Unit) to deal with cases in which children were sexually victimized by offenders from outside their family.  Several other police department around the country soon learned from and copied the work of this Unit.  In March 1977, the Illinois Legislative Investigating Commission submitted a report on the "Sexual Exploitation of Children" to the Illinois General Assembly.  This report states (p.286), "Most of the child molesters whom we encountered during our investigation follow certain patterns.  Frequently, these individuals will look for children involved in legitimate groups – Boy Scouts, summer camps, the Big Brothers – and the molesters will become involved in these groups themselves, thus providing freer access to a wide range of children" (Illinois Legislative Commission, 1977).  In 1982, the Big Brothers/Big Sisters of America published a monograph on child sexual abuse that addressed the issue of child molesters becoming involved in their organization (Wolf, 1982).  In January 1984, the FBI Law Enforcement Bulletin published a special issue on "Pedophilia."  In this issue were two articles that specifically addressed sexual exploitation of children and discussed the issue of offenders gaining access to victims through their occupation or vocation (Lanning & Burgess, 1984 and Goldstein, 1984).

Since 1985, knowledge and insight concerning such acquaintance offenders and their behavior has grown and been more widely disseminated.  For example, editions of my

publication *Child Molesters: A Behavioral Analysis* were published in 1986, 1987, 1992, and 2001 were widely distributed by the National Center for Missing & Exploited Children (NCMEC) in hard copy and by internet download. Without essentially admitting negligence, professionals whose job it is to protect children can no longer claim ignorance about this problem.

Acquaintance molesters are still, however, the most difficult manifestation of sexual victimization of children for society and professionals to face. People seem more willing to accept a sinister stranger from a different location or father/stepfather from a different socioeconomic background as a child molester than a clergy member, next-door neighbor, law-enforcement officer, pediatrician, teacher, coach, or volunteer. Acquaintance molesters often gain access to children through youth-serving organizations. The acquaintance molester, by definition, is one of us. He is not simply an anonymous, external threat. He cannot be identified by physical description and, often, not even by "bad" character traits. Without specialized training or experience and an objective perspective, he cannot easily be distinguished from others.

These kinds of molesters have always existed; but society, organizations, and the criminal justice system have been reluctant to accept the reality of these cases. When such an offender is discovered in our midst, a common response has been to just move him out of our midst, perform damage control, and then try to forget about it or to demonize them as evil deceivers. Sadly, one of the main reasons that the criminal justice system, institutions, and the public has been forced to confront the problem of acquaintance molestation has been the preponderance of lawsuits arising from the negligence of many prominent youth-serving organizations.

One of the unfortunate outcomes of society's preference for a "stranger-danger" concept of victimization is its direct impact on the prevention of the sexual exploitation of children by acquaintances. The victims experience what I call, "say no, yell, and tell guilt." This is the result of societal attitudes and prevention programs that focus only on "unwanted" sexual activity and tell potential child victims to avoid sexual abuse by saying no, yelling, and telling. This technique might (?) work with the stranger lurking behind a tree. Children who are seduced or actively participate in their victimization, however, often feel guilty and blame themselves because they did not do what they were "supposed" to do. They did not recognize, resist, and report. When humans do something they know they were not supposed to do, they tend not to tell others they did it and lie when asked about it. These seduced victims may also feel a need to sometimes describe their victimization in more socially acceptable, but inaccurate ways that relieve them of this guilt. Except for child prostitution, most sexual- exploitation-of-children cases in the United States involve acquaintance molesters who rarely use physical force on their victims.

Advice to prevent the sexual victimization of children by adult acquaintances is more complex and difficult to implement. How do you warn children about molesters who may be their teacher, coach, clergy member, therapist, or Internet "best friend forever" (bff) and whose only distinguishing characteristics are that they will treat the children better than most adults, listen to their problems and concerns, and fill their emotional, physical, and sexual needs? Will parents, society, and professionals understand when the victimization is suspected, discovered, or

disclosed? A great deal of prevention advice simply does not distinguish to which types of sexual victimization it applies. For example, the right to say "no" would be applied differently to a stranger, family member, teacher, or coach.

### Continuum of Relationship

Although stranger, intrafamilial, and acquaintance child molesters have been described here as seemingly separate and distinct offenders, reality is not so simple. Who is a stranger, a family member, or an acquaintance should all be viewed on a continuum. The concept of who exactly is a "stranger" is not always clear-cut and obvious. It can range from someone never seen before and unknown, to someone seen but nameless, to someone named but unknown, to someone named and slightly known, to someone known from the Internet but never seen in person, and anyone in between. Every acquaintance offender started as a "stranger" the first time he met any potential child victim. In addition an offender molesting children to whom he is an acquaintance can also molest children to whom he is a stranger. He might utilize the services of a child prostitute who may or may not know him. The "intrafamilial" molester can range from the biological father, to the stepfather, to mom's live-in boyfriend, to mom's roommate. An intrafamilial offender can molest children other than his own. He may be either a stranger or an acquaintance to these additional victims. Most acquaintance child molesters use their occupations, hobbies, neighborhoods, or online computers to gain access to child victims; however, in addition to or in lieu of these methods, some befriend romance or marry women who already have children. Such molesters may technically be intrafamilial offenders, but dynamically they are not. An acquaintance molester can be a neighbor the child sees every day or a friend the child regularly communicates with on the Internet but sees for the first time when they finally meet in person.

Sex offenders who are strangers can use trickery to initially lure their child victims, but tend to control them more through confrontation, threats of force, and physical force. Long-term access to the child is not necessary. They have been labeled in one publication as *grabbers* (van Dam, 2006). Intrafamilial sex offenders tend to control their victims more through their private access and family authority. This relationship usually gives them long-term access. Their control stems from the fact that they have authority and status over the child and provide or grant developmental necessities such as food, clothing, shelter, attention, etc. Because they are the source of the child's very survival and to continue with a consistent pattern of labeling (*i.e.,* "gr" words), I refer to such offenders as *granters*. In contrast, acquaintance child molesters, although sometimes violent, tend by necessity to control their victims primarily through the grooming or seduction process and by exploiting their immaturity. They usually need long-term access to do this. They have been labeled as *groomers* (van Dam, 2006). This process not only gains the victim's initial cooperation, but also decreases the likelihood of disclosure and increases the likelihood of ongoing, repeated access. Acquaintance offenders with a preference for younger victims (younger than 12) are more likely to also have to spend time seducing the potential victim's parents or caretakers to gain their trust and confidence. An acquaintance molester who uses violence to control victims is more likely to be quickly reported to law enforcement and easily identified. An acquaintance molester who seduces his victims can sometimes go unreported for years if not indefinitely. The short term techniques used by some strangers to

draw children close ("help to look for my puppy" "do you want some candy") so they can use force are examples of luring, not grooming.

From a behavioral analysis perspective, the determination of who is an "acquaintance" child molester should be based more on the process and dynamics of the child victimization and less on the technical relationship between the offender and child victim. An offender who is a stepfather, for example, might be an acquaintance molester who used "marriage" just to gain access to children. The acquaintance child molester might get involved in "abduction", usually by not allowing a child he knows and has seduced to return home. He may wind up abducting or not returning this child because he wants or needs the child all to himself away from a judgmental society. Such missing children often voluntarily go with the offender. Abducting or running away with a child with whom you can be linked is high-risk criminal behavior. Investigators can more easily identify this abductor and therefore more easily find the missing child. Some acquaintance molesters get violent because they misevaluated their victim or want to prevent discovery of the sexual activity.

In a stranger abduction case where the child does not leave voluntarily and is kept alive for a long time, the offender must also have a long-term method of control. This could involve the use of physical controls (*i.e.,* remote location, sound-proof room, underground chamber, or elaborate restraining devices). It could also involve the relationship (and therefore the primary control techniques) between the offender and the child victim evolving and changing over time. The offender gradually moves from being a stranger using force to an acquaintance using seduction to a father-like figure using a family-like bond. Some prefer to believe that this evolution of control mechanism is the result of a mysterious process called "brain-washing" or the "Stockholm Syndrome." I see it as a perfectly understandable result of adult/child interaction and influence over time.

The sexual victimization of children by family members and "strangers" are serious and significant problems. This publication, however, will focus primarily on the problem of sexual exploitation of children by **adult** acquaintances. Peers who are acquaintances also sexually victimize many adolescents. In order for sexual activity between peers to be a prosecutable crime, it would usually have to involve lack of consent in some form. This is a significant and overlooked problem. The focus of this publication, however, will **not** include adolescents sexually victimized by acquaintances who are peers. It will provide insight into the two sides of this relatively common, but poorly understood, type of child victimization.

The **first** side involves understanding the predatory, serial, and usually extrafamilial, sex offenders who sexually exploit children through seduction and/or the collection, creation, or distribution of child pornography. With increasing frequency such offenders are using digital technology and traveling to underdeveloped countries to facilitate their sexual activity with children. The **second** side involves understanding the child victims as human beings with needs, wants, and desires. Child victims cannot be held to idealistic and superhuman standards of behavior. Their frequent cooperation in their victimization must be viewed as an understandable human characteristic that should have no criminal-justice significance.

**Both** sides of this form of sexual exploitation of children must be recognized, understood, and addressed if these cases are going to be effectively investigated and prosecuted. The sad reality is that such behavior does have significance in the perception of society and "real world" of the courtroom.

Society's lack of understanding and acceptance of the reality of acquaintance molestation and exploitation of children often results in:

- Victims failing to disclose and even denying their victimization
- Incomplete, inaccurate, distorted victim disclosures when they do happen
- A lifetime of shame, embarrassment, and guilt for victims
- Offenders being able to exploit numerous victims over an extended period of time
- Unrealistic prevention programs that render them ineffective and compound the first four problems mentioned above

This publication hopes to address and improve this situation for the benefit of the victims, investigators, and prosecutors. While society has become increasingly more aware of the problem of the acquaintance molester and related problems such as child pornography, the voice calling the public to focus only on "stranger danger" and many child-abuse professionals to focus only on intrafamilial sexual abuse still persists. Sexual-exploitation cases involving acquaintance molesters present many investigative challenges, but they also present the opportunity to obtain a great deal of corroborative evidence, get solid convictions, and prevent continued victimization.

## KEY CONCEPTS

In order to effectively investigate and prosecute cases involving sexual exploitation of children by acquaintance child molesters, four significant behavioral concepts of this relatively common but poorly comprehended type of child sexual victimization must be understood. These key dimensions include: *Sexual Activity*; *"Nice Guy" Offenders*; *Compliant Child Victims*; and *Grooming/Seduction*.

### Sexual Activity

The first concept involves understanding the nature and scope of behavior that can constitute *sexual activity*. Defining sexual activity is not as easy as many people think. Is a sex crime determined by the motivation for the acts or the specific acts performed? Sexual victimization of children can run the gamut of "normal" sexual acts from fondling to intercourse; however, looking solely at the nature of the acts performed does not necessarily solve this problem. Obvious "sexual" behaviors (*e.g.,* vaginal or anal intercourse) can be motivated by nonsexual needs (*e.g.,* power and/or anger). This is why it is often said that rape, a crime requiring sexual penetration, is not a sex crime but a crime of violence. Obviously such acts may still be considered sexual assaults by the law even if they were motivated by nonsexual needs.

Sex can, however, also include deviant sexual acts involving behavior such as sadomasochism, bondage, urination, defecation, and indecent exposure. Seemingly "nonsexual"

behavior can be motivated by sexual needs. Some would argue, therefore, that a sex crime is one motivated by sexual gratification.

Some acts are "strict liability" offenses (*i.e.*, an adult engages in vaginal penetration of a child with his erect penis) where the act speaks for itself and there is no need to prove the sexual motivation. Other acts can be sexual acts if you can prove the intent or motivation of the individual. Are kissing, hugging, or appearing naked in front of a child sexual acts? Are giving a child an enema, taking a child's rectal temperature, having a child spit in a cup, cutting a child's hair, massaging a child's feet, or giving a child a back rub sexual acts? Are a physical examination by a doctor, hands-on wrestling instructions by a coach, photographing a child playing dead, or teaching religious rituals sexual acts? It is common for child molesters when interviewed to admit their acts but deny the intent (*i.e.*, "I was demonstrating a wrestling hold with the child." "I was taking measurements for a study on adolescent growth." "It was part of an initiation ceremony." "I was checking for the effects of steroids."). All these acts could be sexual acts if you could prove the intent was for sexual gratification. As discussed, such "weird" or unusual sexual behaviors are referred to by mental health professionals as sexual *paraphilias*. Seemingly "nonsexual" behavior can be in the service of sexual needs.

How does an investigator prove intent or motivation? Can a crime have more than one motivation? Can we determine motivation from the offender? We know that offenders are more reluctant to admit sexual motives than other types of motives (*e.g.*, profit, revenge, anger, power). Does the offender always know his motivation? Potential ways to address this problem will be discussed later in this publication.

It is important for investigators to realize that some acts may not be crimes even if they can prove they were done for sexual gratification. Photographing children on the playground, tape recording the belching of boys or listening to children urinate in a public bathroom can be sexual acts for some individuals, but they are most likely not crimes.

Other acts involve societal and cultural judgments. Do allowing children to watch adults have sex or gain access to pornography constitute child sexual abuse or child neglect? Should artists, photographers, and therapists have special privileges under child-pornography statutes? Can a high-quality artistic photograph taken with an expensive camera and printed on expensive paper still be child pornography? Is it child abuse to ask a child to reenact sexual abuse the child has described? Is it a crime to photograph the reenactment? Is burning a child's genitals with a lit cigarette physical abuse, sexual abuse, or both? Does it ever matter? The specific motivation might have important investigative or prosecutive significance in some cases.

The criminal justice system must look to the law to determine what a sex offense is and what the statutory elements of the offense are. Some states allow wider latitude in looking at motivation to determine what is a sex crime. To what or whom do others look to make this determination? Untrained individuals and organizations all too frequently dismiss questionable activity as "public displays of affection," "boundary violations," or "inappropriate conduct." Although such activity is obviously not always sexual in nature, it can be. Some "inappropriate" activity that adults engage in with children can be part of a "grooming" or seduction process. Such grooming activity can sometimes also provide sexual gratification for the adult. Lay

people and uninformed organizations rarely make the effort to evaluate such behavior in totality and in the context of past behavior. When evaluating the significance and relevance of offender behavior and children's allegations, interveners should always consider both the activity and its possible motivations. Such activity (criminal and non-criminal) might even constitute legally admissible prior or subsequent like acts.

Having a broader conceptualization and understanding of what could constitute sexual behavior should also improve the ability of professionals to evaluate questionable behavior and set proper boundaries for interaction with children.

## "Nice Guy" Offenders

The second key concept involves understanding the *nice guy offender* who seems to love and is often loved by children. Acquaintance offenders typically sexually exploit children through seduction and/or the collection, creation, or distribution of child pornography. They are typically serial offenders who are extremely predatory, but rarely violent. These acquaintance offenders are frequently described as "nice guys" and "pillars of the community" and quite often they actually are. Many individuals do not prevent, recognize, or accept the sexual victimization of a child by a respected member of society because they cannot believe that a man who is good and spiritual and who seems to truly care for children could be a child molester.

Such offenders can be the Big Brother of the Year, the most popular teacher, or the best soccer coach. It is not uncommon for these offenders to be viewed as "child magnets" or "pied pipers" who have an extraordinary ability to relate to children and to whom many children are drawn. This is not to say that in some cases children will not sense that some adult is "weird" or has a "problem" before many adults or parents do. Parents who desperately want their children to get good grades, become star athletes, get into modeling or show business, have an adult male role model, or have a good babysitter, may actually push their children toward such offenders. As will be explained later, these offenders usually groom and seduce their child victims. Being "nice" has little to do with being a child molester except that it increases the likelihood of repeatedly committing the crime and getting away with it. A desire to work with or help children and an ability to relate to them does not necessarily mean someone is a child molester, but it does not mean someone is not.

Such nice guy offenders usually have strong needs to rationalize and validate their sexual behavior. This seems to be especially true of more intelligent, better educated individuals who molest children. Most of them seem to have an overwhelming need to convince primarily themselves that: (1) the behavior they engaged in is not really sex; (2) the child doesn't understand or remember the activity and is therefore not harmed; (3) this is an expression of love and caring; and/or (4) they are entitled to this because of all the good they do. Their need to rationalize their sexual interests and behavior often leads them to be involved in "good works" that help troubled, needy children. They may become teaches, coaches, missionaries or cyber vigilantes. Obviously, such pursuits also give them convenient access to vulnerable children and socially acceptable reasons for interaction with them. The psychological need to validate their sexual interest in children (*i.e., ritual*) and the functional need to gain access to potential victims (*i.e., MO*) are not mutually exclusive.

In the United States during the early 21st century, the term most commonly used to refer to any adult who sexually victimizes a child is *predator*. Many child molesters are certainly predatory in their behavior, but the widespread use of this term is unfortunate and counter-productive. The term has a very negative connotation and conjures up an image of disguised evil and inevitable violence. In my experience, the most prolific and persistent child molesters rarely use violence to manipulate and control their victims. Some child molesters are described as "nice guys" not because they are successfully disguising their true wickedness but because overall they actually are nice. When used in prevention programs, the term *predator* will often be inconsistent with the perceptions of potential child victims. Moreover, it may incorrectly suggest to staff, parents, and program participants that people who are pleasant, kind, and helpful cannot be sex offenders. If the term is used, any discussion should clearly include the possibility that such *predators* may regularly go to church, work hard, be kind to neighbors, love animals, and help children.

Recognizing that even "nice guys" can be child molesters should improve the ability of professionals to investigate these cases. Knowing that these types of offenders will generally try to conceal their sexual behavior from anyone they believe will not accept their rationalizations for it, but often disclose, at least in part, their sexual behavior to those they believe will accept their rationalizations should assist in interview situations. It is important that professionals attempting to elicit incriminating information from such offenders communicate, at least to begin with, in a nonjudgmental, nonthreatening, and receptive demeanor.

**Compliant Child Victims**

The third concept involves understanding the *compliant child victim*. In sex crimes the fundamental legal difference between victimization of an adult and a child is the issue of *consent*. With sexual activity between adults, with a few rare exceptions, there must be a lack of consent in order for there to be a crime. With sexual activity between children and adults, there can be a crime even if the child cooperates or "consents." But the reality of age of consent is not so simple.

As stated, there can often be a conflict between the law and society's viewpoint when it comes to defining a child and many people using the term have a mental image of children 12 or younger. Adolescent child victims often look, act, and have sex drives like adults and may or may not be considered children under different statutes or by society. Issues such as whether the victim consented or was the offender a guardian or caretaker can have important legal significance. In some jurisdictions, sixteen-year-olds may be able to consent to have sex with the man down the street, but not with their father or schoolteacher. It is sometimes unclear how the law evaluates consent when dealing with sexual partners of varying age differences. To make things more complicated, the age and circumstances under which a child can marry an adult also vary from state-to-state. Laws that determine when a child can marry are not the same as laws that determine the age of consent for sex. In many instances, the easiest way for an adult to have sex with a child and come under no legal scrutiny is to marry the child.

The term *compliant child victim* is used to describe those children who in any way, partially or fully, cooperate, in their sexual victimization without the threat or use of force or

violence.  Some of the sexual acts engaged in with a child might be considered violent in nature, but violence is not used as the primary access and control mechanism.  In essence, if such victims were adults, the activity would not be a crime.  Since I first began to speak out about this issue, some people have objected to my use of the term *compliant*.  They have suggested terms such as *voluntary*, *cooperating*, *accommodating*, *willing*, *statutory*, *sexualized*, *Romeo and Juliet*, etc.  Several have recommended I use the term *groomed* child victim (see discussion of grooming that follows).  The problem is that grooming may be the most common reason children are compliant but not the only reason.  My response to these suggestions is that they pick whichever one they like.  Although labels can be important, the most important thing is to identify and understand the behavior involved and recognize that compliant child victims **ARE** real victims of crime.  Such compliant children are victims not because they were groomed, brain-washed, or come from dysfunctional homes, but simply because of their date of birth.

Children are human beings with normal needs, wants, and desires.  As human beings, many children are willing to trade sex, whether or not they understand what it is, for the affection and attention of a "nice guy."  In theory, the law recognizes developmental limitations of minors and affords them with special protection.  The repeated use, however, of terms such as rape, sexual violence, assault, attack, sexually violent predator, and unwanted sexual activity, when discussing or inquiring about the sexual victimization of children assumes or implies in the minds of many that all **real** child victims resist sexual advances by adults, are then overpowered by coercion, trickery, threats, weapons, or physical force, and then report it the first chance they can.  The real reason we protect children and do not recognize their "consent" to have sex with adults is not because they are "innocent," but because they are developmentally immature (*e.g.,* brain development, cognitive decision making, and judgment).

Whether or not the child resisted, said "No," was overpowered, and immediately reported it or even enjoyed the sexual activity are not necessarily elements in determining if a child was criminally sexually victimized by an adult.  Even those children who nonviolently initiate the sexual activity with an adult can be victims.  It is the adult who has the legal obligation and maturity to say "No" to such advances.  Understanding all this is especially problematic for the public (*i.e.,* potential jurors) and professionals (*i.e.,* teachers, physicians, therapists, church leaders) who lack specialized training in criminal law and may not rely on strict legal analysis.  They have also been influenced by the media, professionals, and prevention programs that either state or imply erroneously that all child victims are forced or tricked into unwanted sexual activity with adults.  Compliant child victims, even after becoming adults, often either deny their victimization or disclose it in inaccurate, but more socially acceptable ways because they suffer from shame, guilt, and embarrassment.  Society tells them in so many ways that they are not "real" victims.  When an adult and child have compliant or nonviolent sex, the adult is always the offender and the child is always the victim.

Interveners cannot rely on or expect all children to resist and report their sexual victimization.  It makes no sense to ask children to tell parents or authority figures only about "unwanted" sexual contacts.  They are children.  Sexual activity with adults is a problem whether or not it is wanted.  It is more difficult to develop reasonable strategies to try to prevent things that a child may think he or she wants to happen.  Young children are more likely to listen to what adults say but less likely to truly understand.  Older children are more likely to understand,

but less likely to listen.  If we are going to count adolescent children as victims, some of what is said and done to prevent their sexual victimization must incorporate the reality of adolescent development and behavior.  Making children safer from sexual victimization by acquaintances should rely less on hardware, software, simplistic rules, and dire warnings about evil predators and more about involvement in their lives, communication, and love.

Investigative suggestions for dealing with compliant child victims and the problems they present will discussed later in this publication.

### Grooming/Seduction

The fourth and final key concept for developing an enhanced insight into acquaintance molesters involves understanding the *grooming/seduction* process.  As previously stated, acquaintance child molesters, although sometimes violent, tend by necessity to control their victims primarily through the grooming or seduction process.  In sexual exploitation of children cases, this is today more commonly referred to as grooming, but historically the process has been more often called seduction.  Although some people see a subtle distinction, in this publication both terms will be used interchangeably.  I actually prefer the term *seduction* because it is better known and more understandable.  These offenders seduce children much the same way adults seduce one another.  This technique is no great mystery.  Between two adults or two teenagers it is usually called dating.  Years ago it was called courting.  The major difference, however, is the disparity between the adult authority of the child molester and vulnerability of the child victim.  It is especially unfair if the child molester is a prestigious authority figure (*i.e.*, teacher, law enforcement officer, clergy member, youth volunteer) and the child is an easily sexually aroused, curious, rebellious adolescent or an easily confused, naive, trusting young child.

As used in this publication, *grooming/seduction* is defined as a variety of techniques used by a sex offender to access and control their potential and actual child victims.  This process takes access, time, and interpersonal skill.  How much time depends on the needs of the child and skills of the adult.  If done well, the process not only gains the victim's initial cooperation, but also decreases the likelihood of disclosure by the victim and increases the likelihood of ongoing, repeated access.  The greater the skill of the offender in selecting and seducing vulnerable victims, the more successful the acquaintance molester is and the longer he avoids discovery.  How long such offenders get away with this type of victimization is usually determined by how well they select their victims, how good they are at identifying and filling their victims' needs, how much time they have to invest in the process, how proficient they are at seducing and controlling their victims, and how proficient others who might observe the process are at recognizing and responding to it.  Although it is possible to manipulate and control child victims through the infliction of nonviolent stress, pressure, and pain, these techniques will generally not be considered grooming for purposes of this publication.

Acquaintance child molesters typically groom and seduce their child victims with the most effective combination of attention, affection, kindness, privileges, recognition, gifts, alcohol, drugs, or money until they have lowered the victims' inhibitions and gained their cooperation and "consent."  The exact nature of this seduction depends in part on the developmental stages, needs, and vulnerabilities of the targeted child victims and the nature of

the relationship with the offender. The skilled offender adjusts his methods to fit the targeted child. Offenders who prefer younger child victims are more likely to first "seduce" the victim's parents to gain their trust and obtain increased access to the potential victim. The offender then relies more on techniques involving fun, games, and play to manipulate younger children into sex. Those who prefer older child victims are more likely to take advantage of normal time away from their family and then rely more on techniques involving ease of sexual arousal, rebelliousness, inexperience, and curiosity to manipulate the children into sex. Some offenders simultaneously befriend their victim's parents (*e.g.*, telling parents they want to mentor or help their child) and work to alienate the child from the parents (*e.g.*, telling child that parents don't want them to have fun).

The grooming or seduction process usually consists of: 1) identifying preferred or acceptable child targets; 2) gathering information about interests and vulnerabilities; 3) gaining access (*i.e.*, sports, religion, education, online computer, etc); 4) filling emotional and physical needs; 5) lowering inhibitions; and 6) gaining and maintaining control (*i.e.*, bonding, competition, challenges, peer pressure, sympathy, threats, etc.). Although the vulnerability may be greater when a troubled child from dysfunctional family is groomed by an adult authority figure, the fact is that **any** child can be groomed by **any** reasonably nice adult with interpersonal skills.

Many children have only a vague or inaccurate concept of "sex." They are seduced and manipulated by more experienced adult offenders and often, depending in part on their age and intellect, do not fully understand or recognize what they were getting into. As previously stated, some "inappropriate" activity that is part of this "grooming" or seduction process can also provide sexual gratification for the adult. These seduced and sometimes compliant victims are less likely to disclose their victimization and more likely to voluntarily return to be victimized again and again. Younger children may believe they did something "wrong" or "bad" and are afraid of getting into trouble. Older children may be more ashamed and embarrassed. Some victims not only do not disclose what happened, but they often strongly deny it happened when confronted.

Recognition and understanding of the concepts of grooming and compliance must be applied to all child victims and not just those who fit some preconceived stereotype of innocence. Whether a child comes from a "good" or dysfunctional home and does or does not get attention and affection at home should not be the determining factors in accepting their vulnerability to grooming and seduction. Child victims cannot be held to idealistic and superhuman standards of behavior. Their frequent cooperation in their victimization must be viewed as an understandable human characteristic and must be addressed when developing investigative and prevention strategy (Lanning, 2005).

## AGE OF CONSENT

There was an infamous case in the early 1980s involving a judge who sentenced a convicted child molester to a minimal sentence because the judge felt the 5-year-old victim was "sexually promiscuous." Society and professionals were outraged and demanded that the judge be removed from the bench. The sad reality is that most people were outraged for the wrong

reason – because they thought it was impossible for a 5-year-old child to be sexually promiscuous. Although not typical or probable, it is possible for such a child to be "sexually promiscuous." Of course this is most often the result of victimization, not the cause. It should, however, make no difference whether or not the 5-year-old child was sexually promiscuous. It in no way lessens the offender's crime or responsibility. If you change the case slightly and make the victim 9-years-old, does that make a difference? Most people would probably say no. If you change it again and make the victim 12-years-old, many people would still say it makes no difference, but might want to see a picture of the victim. If you change it again and make the victim 13-, 14-, 15-, or 16-years-old, the response of society and the law would vary greatly.

With sexual activity between children and adults, there can be a crime even if the child cooperates or "consents." But the reality of age of consent is not so simple. Age of consent can vary depending on the type of sexual activity and individual involved. At what age can a child consent to get married, engage in sexual activity, appear in sexually explicit visual images, or leave home to have sex with an unrelated adult without parental permission? Federal case law seems to suggest that the consent of a 14-year-old who crosses state lines after running off and having sex with a 40-year-old man she met on the Internet is a valid defense for the kidnapping charge, but not for the sexual assault charge. At what age can an adolescent consent to have sex with a relative, a teacher, a coach, an employer, or a 21-year-old boyfriend?

In the United States, society and criminal investigators seem to have a preference for sexual victimization cases where the victim, adult or child, clearly does not consent. Among lack of consent cases, the least preferred are cases where the victim could not consent because of self-induced use of drugs or alcohol. Cases where the victim was just verbally threatened are next, followed by cases where a weapon was displayed. For purposes of ease of proof, the most preferred lack-of-consent cases are those where the victim has visible physical injuries or is, sad to say, dead. Many seduced child victims may inaccurately claim they were asleep, drunk, drugged, or abducted in part to meet this lack of consent criteria and in part to avoid embarrassment.

Sexual-victimization cases in which the child victim is not forced or threatened and cooperates or "consents" are more troubling and harder for society and interveners to address. If such victims were adults, there usually would not even be a crime. Although "consent" is supposed to be irrelevant in child-sexual-victimization cases, there are unspoken preferences held by society and professionals in these "compliant child victim" cases as well. The most preferred cases are those "consent" cases where the victim's cooperation can be explained as due to some general fear or ignorance about the nature of the activity. That is, the child was afraid to resist or tell or did not understand what was happening. The next most preferred are those cases where the child was tricked, duped, or indoctrinated. If the offender was an authority figure, this "brainwashing" concept is even more appealing. Next on this preference continuum are those cases in which the victim was willing to trade "sex" for attention, affection, and romance. Much less acceptable are those cases in which the child willingly traded sex for material rewards (*e.g.*, clothes, shoes, trips) or money (*i.e.*, prostitution). Almost totally unacceptable to many, including some child abuse professionals, are those cases in which the child engaged in the sexual activity with an adult because the child enjoyed the sex. In fact, it is almost a sacrilege to even mention such a possibility. These societal and criminal-justice preferences prevail in spite

of the fact that almost all human beings trade sex for attention, affection, privileges, gifts, or money. Many seduced child victims may inaccurately claim they were afraid, ignorant, or indoctrinated in part to meet the societal preferences for such compliance or cooperation and in part to avoid embarrassment.

Any of the above scenarios in various combinations are certainly possible. A child might cooperate in some sexual acts and be clearly threatened or forced into others. All are crimes. Investigators and prosecutors should always attempt to determine what actually happened, not to confirm their preconceived beliefs about sexual victimization of children.

Most acquaintance-exploitation cases involve these seduced or compliant child victims. Although applicable statutes and investigative or prosecutive priorities may vary, officers investigating sexual- exploitation cases must generally start from the premise that the sexual activity is not the fault of the victim even if the child:

- Did not say no
- Did not fight
- Actively cooperated
- Initiated the contact
- Did not tell
- Accepted gifts or money
- Enjoyed the sexual activity

Investigators must also remember that many children, especially those victimized through the seduction process, often:

- Trade sex for attention, affection, or gifts
- Are confused over their sexuality and feelings
- Are embarrassed and guilt-ridden over their activity
- Describe victimization in socially acceptable ways
- Minimize their responsibility and maximize the offender's
- Deny or exaggerate their victimization

All these things do not mean the child is not a victim. What they do mean is that children are human beings with human needs. Society seems to prefer to believe that children are pure and innocent. The FBI's national initiative on computer exploitation of children is named "Innocent Images." The U.S. Department of Justice initiative on child prostitution is named "Innocence Lost." Many children are seduced and manipulated by clever offenders and usually do not fully understand or recognize what they were getting into. Even if they do seem to understand, the law is still supposed to protect them from adult sexual partners. Consent should not be an issue with child victims. Sympathy for victims is, however, inversely proportional to their age. As with poorly understood offender patterns of behavior, the dynamics of these "consenting" victim patterns of behavior can be explained to the court by an education expert witness (Appendix II "Appellate Case Decisions"). The ability to make these explanations, however, is being undermined by the fact that children at an age when they cannot legally choose to have sex with an adult partner can choose to have an abortion without their parents'

permission or be charged as adults when they commit certain crimes. Can the same 15-year-old be considered both a "child" and an "adult" in the criminal-justice system?

## OFFENDER STRATEGIES

### Control

Child molesters control their victims in a variety of ways. In acquaintance-exploitation cases with multiple victims, they control them primarily through the seduction or "grooming" process. As previously stated, they seduce their victims with attention, affection, kindness, gifts, and money until they have lowered the victims' inhibitions and gained their cooperation and "consent." The nature of this seduction is partially dependent on the developmental stages, needs, and vulnerabilities of the targeted child victims. Offenders who prefer younger child victims are more likely to first "seduce" their parents and then rely more on techniques involving fun, games, and play to manipulate the children into sex. Those who prefer older child victims are more likely to take advantage of normal time away from their family and then rely more on techniques involving ease of sexual arousal, rebelliousness, and curiosity to manipulate the children into sex. These seduced and compliant victims are less likely to disclose their victimization and more likely to voluntarily return to be victimized again and again.

Maintaining control is important in the ongoing sexual exploitation of children. It takes a significant amount of ability, cunning, and interpersonal skill to maintain a simultaneous sexual relationship with multiple partners. It is especially difficult if you have the added pressure of concealing illegal behavior. In order to avoid detection and disclosure, an offender must know how to control and manipulate children. As stated, control is maintained primarily through attention, affection, and gifts – part of the seduction process. As previously stated, these techniques must also be adjusted for the varying developmental stages, needs, and vulnerabilities of children of different ages.

### The Seduction Process

For a longer term relationship, the seduction process is the most effective control technique. An overview of this process was previously discussed. The seduction process begins when the offender finds or sees a potential victim who fits his age, gender, and other preferences. It can be in person or online. It can be a 6-year-old girl or a 14-year-old boy. Child molesters, however, can and do have sex with children and sometimes with adults who may not fit their preferences. A child molester may be experimenting or unable to find a child who fits his preference. Child molesters who prefer adolescent boys sometimes become involved with adolescent girls as a method of arousing or attracting the boys. In addition, child molesters may not molest some children to whom they have access and opportunity because the children did not meet their preferences or were not vulnerable to their advances or seduction techniques.

The offender's next step in the seduction process is to gather information about the potential victim. This may involve nothing more than a 10-minute spot evaluation of the child's demeanor, personality, dress, and financial status. Through practice, many child molesters have developed a real knack for spotting the vulnerability in each potential victim. Other offenders

may have access to school, medical, mental-health, or court records. These records could be valuable in determining a child's interests or vulnerabilities. Almost any child can be seduced, but the most vulnerable children tend to be those who come from dysfunctional homes or are victims of emotional neglect.

The seduction process takes place over time and usually requires ongoing access to the targeted child. The offender who is operating a sex ring has many other victims. He is willing to put in the time it takes to seduce a child. It may take a few minutes or years. Some molesters may even start grooming a potential victim long before the child has reached his age preference.

In addition to seducing his child victims, offenders often "seduce" the victim's parents, gaining their trust and confidence, so that they will allow him free access to their children. A favorite target victim is a child living with a single mother. He may offer to babysit or watch her children after school. The offender will sometimes pretend romantic interest in the mother or express a desire to be a father figure or mentor for her child. He may even marry her or move in with her. The relationship with the mother can be used as a cover for his interest in children, and her child can be used as bait to lure or gain access to other children. For example most parents would not be reluctant to allow their child to go on an overnight trip with the "father" of one of their child's friends. In this case, however, the man in question is not the child's father or even the stepfather. He is just a man who lives with the mother. Some offenders legally adopt or become the legal guardian of potential victims. Once a molester has put in the time and effort to seduce a child, he will be reluctant to give up access to the child until he is finished with the child.

Many offenders possess an important talent in the seduction process: the ability to identify with children. They know the "in" video games, toys, television shows, movies, music, computers, and Internet sites. They are skilled at recognizing and then temporarily filling the emotional and physical needs of children. The essence of the seduction process is the offender providing attention, affection, and gifts to the potential victim. Gifts and financial incentives are important, especially for kids from lower socioeconomic backgrounds, but attention and affection is the real key. How do you tell a child not to respond to attention and affection? All children crave it, but especially children who are not getting it. Moreover, because the offender is interested only in short-term gain, he may allow his victims to "break the rules" – play basketball or football in the house, make a mess, swim without a bathing suit, view pornography, drink alcohol, use drugs, drive a car, or go to bars or restaurants known to have physically well-endowed female staff. The homes of many child molesters with a sexual preference for children are miniature amusement parks filled with games, toys, computers, and athletic equipment appealing to children of their age preference.

The typical adolescent, especially a boy, is **easily sexually aroused, sexually curious, sexually inexperienced,** and **somewhat rebellious**. All these traits combine to make the adolescent child an easy victim of this seduction. It takes almost nothing to get an adolescent boy sexually aroused. An adolescent child with emotional and sexual needs is simply no match for an experienced 50-year-old man with an organized plan. Yet adult offenders who seduce them, and the society that judges them, continue to claim that these victims "consented." The result is a victim who feels responsible for what happened and embarrassed about his actions.

Once a victim is seduced, each successive sexual incident becomes easier and quicker. Eventually the child victim may even take the initiative in the seduction.

The next step in the seduction process is the lowering of inhibitions. It is easy to be judgmental toward victims when you look at only the end product of their seduction. At the beginning of the relationship the child is looking for friendship, emotional support, a job, or just some fun. The lowering of sexual inhibitions is usually done so gradually and skillfully that the victim does not realize he or she is a victim until it is too late. It may begin with simple affection such as a pat, hug, or kiss on the cheek. In addition to being part of the seduction process, such activity can also be sexual acts themselves. Sexual activity can begin with conversation about sex. This might include "dirty" jokes and encouraging the child to share their sexual attitudes and feelings. The activity can progress to fondling while wrestling, playing hide-and-seek in the dark, playing strip poker, swimming nude in the pool, drying the child with a towel, massaging an injury, giving a back rub, tickling, playing a physical game, or cuddling in bed. Some offenders may have no interest in progressing beyond such acts. They are not a means to an end, but an end in themselves as their preferred sexual activity. The introduction of photography or video cameras during this process is common. Innocent pictures progress to pictures of the "fun and games" or playing movie star/model that then progress to pictures of the nude or partially nude child that then escalate into more sexually explicit pictures.

Adult pornography is frequently left out for the children to "discover." A collection of adult pornography is effective in sexually arousing and lowering the inhibitions of adolescent boys. This is an important reason why some child molesters collect adult pornography. Some of them may even attempt to use this collection as proof that they do not have a sexual preference for children and judges may prevent its admissibility as not being probative. Alcohol and drugs are also used, especially with adolescent boys, to lower inhibitions. As with most sexual seduction, the process often involves attempted sexual acts and rejection, followed by negotiation and compromise, and then renewed attempts with no physical violence. By the time the victims realize what is going on, they are in the middle of it and ashamed of their complicity. They did not "say no, yell, and tell." Much of this grooming process can even take place online without even meeting in person.

Offenders usually work toward a situation in which the child has to change clothing, spend the night, or both. If the child molester achieves either of these two objectives, the success of the seduction is almost assured. The objectives of changing clothes can be accomplished by such ploys as squirting with the garden hose, turning up the heat in the house, exercising, taking a bath or shower, physical examination of the child, or swimming in a pool. Spending the night (*i.e.*, field trips, camping, babysitting) with the child is the best way for the sexual activity to progress. Elaborate, scripted seduction techniques specifically targeted at children are more consistent with the behavior patterns of preferential sex offenders than with those of opportunistic situational sex offenders.

Some victims come to realize that the offender has a greater need for this sex than they do, and this gives them great leverage against the offender. The victims can use sex to manipulate the offender or temporarily withhold sex until they get things they want. A few victims even blackmail the offender especially if he is married or a pillar of the community.

Although all of this is unpleasant and inconsistent with our idealistic views about children, as stated, when adults and children have "consensual" sex the adult is always the offender, and the child is always the victim. Consent is an issue only for adults.

### Cases Involving Multiple Child Victims

The ongoing sexual victimization of multiple children is dynamic and ever changing. It is like a pipeline. At any given moment there are victims being recruited, seduced, molested, and let go or "dumped." For most acquaintance offenders it is easy to recruit, seduce, and molest the victims, but it is difficult to let the victims go without their turning against the offender and disclosing the abuse.

The offenders control the victims once they are in the pipeline through a combination of bonding, competition, and peer pressure. Most children, especially adolescent children, want to be a part of some peer group. Any offender operating a sex ring has to find a way to bind the victims together. Some offenders use an existing structure such as a scout troop, sports team, or school club. Other offenders create their own group such as a magic club, computer club, or religious group. Some offenders just make up a name and establish their own rules and regulations. They may call themselves the "88 Club" or the "Winged Serpents." Some offenders have used religion, satanism, and the occult as a bonding and controlling mechanism.

Competition and creating challenges, sometimes focusing on sexual acts, are also effective control techniques. Victims may compete over who can do an act first or longest. A series of sexual acts may result in some special reward or recognition. The offender may use peer pressure to control his victims, and the children will enforce the rules on each other. No victim wants to be the one to ruin it for anyone else or embarrass others, and each victim may think he or she is the offender's "favorite." All these techniques simply capitalize on the developmental needs of children of different ages.

Violence, threats of violence and blackmail are most likely used by the offender when pushing a victim out or attempting to hold onto a still-desirable victim who wants to leave. Sexually explicit notes, audiotapes, videotapes, and photographs are effective insurance for a victim's silence. Victims worried about disclosure of illegal acts such as substance abuse, joyriding, petty thefts, and vandalism are also subject to blackmail. Victims and their families from higher socioeconomic backgrounds may be more concerned about the public embarrassment of any disclosure. Many victims, however, are most concerned over disclosure of and therefore more likely to deny engaging in sex for money, bizarre sex acts, homosexual acts in which they were the active participant, and sex with other child victims. In child sex rings not only does the offender have sex with the child but, in some cases, the children have sex with each other. While children may report that they were forced by the offender to perform certain acts with him, they find it hard to explain sexual experiences with other children; therefore, they frequently deny such activity. One offender told me that if you select your victims and seduce them "properly," the secret takes care of itself.

When trying to push a victim out the end of the pipeline, the offender may pass the child to another offender who prefers older children. The victim now enters a new pipeline as a "pre-

seduced" victim requiring little grooming. "Dumping" the child can also be made easier and safer if the child is promoted to another grade or school, moves onto another level of scouting or sports, or moves out of the neighborhood.

**Offender-Victim Bond**

Because victims of acquaintance exploitation usually have been carefully seduced and often do not realize or believe they are victims, they repeatedly and voluntarily return to the offender. Society and the criminal-justice system have a difficult time understanding this. If a boy is molested by his neighbor, teacher, or clergy members, why does he "allow" it to continue? Most likely he may not initially realize or believe he is a victim. Some victims are simply willing to trade sex for attention, affection, and gifts and do not believe they are victims. The sex itself might even be enjoyable. The offender may be treating them better than anyone has ever treated them. They may come to realize they are victims when the offender pushes them out. Then they recognize that all the attention, affection, and gifts were just part of the master plan to use and exploit them. This may be the final blow for a troubled child who has had a difficult life.

Most of these victims never disclose their victimization. As stated, younger children may believe they did something "wrong" or "bad" and are afraid of getting into trouble. Older children may be more ashamed and embarrassed. Many victims not only do not disclose, but they strongly deny it happened when confronted. In one case several boys took the stand and testified concerning the high moral character of the accused molester. When the accused molester changed his plea to guilty, he admitted that the boys who testified for him were also victims. In another case a 16-year-old victim tried to murder the man who had sexually exploited him but still denied he was sexually victimized. He pled guilty rather than use the abuse as a mitigating circumstance and publicly admit he had engaged in sexual activity with a man. He privately admitted his victimization to a prosecutor, but said he would always publicly deny it.

The most common reasons that victims do not disclose are: 1) stigma of homosexuality, 2) lack of societal understanding, 3) presence of positive feelings for the offender, 4) embarrassment or fear over their victimization, or 5) do not believe they are victims. Since most of the offenders are male, the stigma of homosexuality is a serious problem for male victims. Although being seduced by a male child molester does not necessarily make a boy a homosexual, the victims do not understand this. If a victim does disclose, he risks significant ridicule by his peers and lack of acceptance by his family.

These seduced or compliant child victims obviously do sometimes disclose. Such victims often disclose because the sexual activity is discovered (*e.g.*, abduction, recovered child pornography, overheard conversations) or suspected (*e.g.*, statements of other victims, association with known sex offender, proactive investigation) and they are then confronted. Others disclose because the offender misjudged them, got too aggressive with them, or is seducing a younger sibling or close friend of theirs. Victims sometimes come forward and report because they are angry with the offender for "dumping" them. They might be jealous that the offender found a younger victim. They often disclose because the abuse has ended, not to end

the abuse. Victims also disclose months to years later when their life situation changes (*i.e.,* new girlfriend/boyfriend, marriage, birth/death of child, personal crisis, etc.)

The behavior and reactions of such child victims should not be evaluated for consistency with that of victims who have been forced against their will, but with that of victims who have been manipulated into their victimization. Failure to immediately report it, initial denials when questioned about it, attempts to describe it in more socially acceptable ways, varying versions of what happened, embarrassment and shame, and reluctance to tell their parents and others, and anger over the relationship ending are all consistent with child victims seduced and manipulated by an adult offender who is an acquaintance. When many compliant child victims eventually do disclose their victimization, they are often mad and feel deceived and used when they find out the offender had a new "girlfriend" or will no longer respond to their contacts. Similar behavior (*e.g.,* denial, lying, changing versions, inconsistencies, etc.), however, can be seen in cases involving false allegations. Juries have the right to hear and consider all explanations for such behavior. Making some false allegations does not necessarily mean an entire allegation is false. The court can sometimes be assisted in this evaluation through the use of an education expert witness (Appendix II "Appellate Case Decisions").

A particular aspect of this offender-victim bond is especially troubling for the criminal justice system. Some older child victims, when being pushed out, or while still in the pipeline, may assist the offender in obtaining new victims. They may still want to trade sex for attention, affection, gifts, or money, but their sexual worth has diminished in value. They have to come up with something else of value. They then become the bait to lure other victims. They may sexually victimize younger children and provide web-cam or recorded images of the activity to the offender. Such recruiters or "graduate" victims can and should be considered subjects of investigation. Although their victimization does not excuse their behavior, it should be viewed and evaluated (*i.e.*, role of adult offender, age of victim offender) within the context of their ongoing victimization.

**High-Risk Situations**

There are certain high-risk situations that arise in investigating acquaintance-exploitation cases. Unfortunately certain youth organizations inadvertently provide the child molester with almost everything necessary to operate a child sex ring. A scouting organization, for example, fulfills the offender's needs for 1) access to children of a specific age or gender, 2) a bonding mechanism to ensure the cooperation and secrecy of victims, and 3) opportunities to spend the night with a victim or have a victim change clothing. The bonding mechanism of the scouts is especially useful to the offender. Loyalty to the leader and group, competition among boys, a system of rewards and recognition, and indoctrination through oaths and rituals can all be used to control, manipulate, and motivate victims. Leaders in such organizations, especially those who are not the parents of children involved, should be carefully screened and closely monitored.

Another high-risk situation involves high-status authority figures. As stated above, child molesters sometimes use their adult authority to give them an edge in the seduction process. Adults with an added authority (*e.g.,* teachers, camp counselors, coaches, religious leaders, law-enforcement officers, doctors, judges) present even greater problems in the investigation of these

cases. Such offenders are in a better position to seduce and manipulate victims and escape responsibility. They are usually believed when they deny any allegations. In such cases the law-enforcement investigator must always incorporate understanding of the seduction process into interviews, take the "big-picture" approach, and try to find multiple victims or recover child pornography or erotica in order to get a conviction.

The most difficult case of all involves a subject who has an ideal occupation for any child molester: a therapist who specializes in treating troubled children. This offender need only sit in his office while society preselects the most vulnerable victims and brings them to him. The victims are by definition "troubled" and unlikely to be believed if they do make an allegation. In addition such therapists, especially if they are psychiatrists or physician's assistants, can claim that certain acts of physical touching were a legitimate part of their examination or treatment. They may also claim to be conducting research on child development or sexual victimization. Again such a case could probably be proven only through the identification of patterns of behavior, multiple victims, and the recovery of child pornography or erotica. Fortunately for law enforcement in the United States, but unfortunately for children in the United States, such offenders almost always have highly predictable behavior patterns, multiple victims, and child-pornography and erotica collections.

## USE OF "COMPUTERS"

Not too long ago, the method most likely used to access the Internet was a desktop or laptop computer at home or work. Methods most likely used to store digital information were the random access memory (RAM) and hard drive of the computer and a few portable devices (*e.g.,* floppy disks, CDs, DVDs). Now common methods used to access the Internet also include netbooks, video game systems, smart phones, and Wi-Fi mobile platforms. Common digital storage devices now also include external hard drives, wireless routers, digital audio or video player/recorders (including cable box, TiVo), USB flash drives ("thumb drive," "jump drive"), flash memory cards (varying in format, capacity, and physical size), MP3 players or iPods, digital cameras, and cell phones. To save time and space in this chapter, these varying items will most often simply be referred to as computers and digital memory storage devices. This technology will undoubtedly continue to change at a rapid pace.

We have historically warned our children about the dangers associated with strangers, but often neglected to help them understand that sex offenders are often people they have come to know either in person or now online. Throughout history, nonfamily members who sexually exploited children have frequented the places where children gather. School yards, parks, and malls have been public contact places for some offenders. Many offenders with better interpersonal skills, however, have gained access to children through their occupations, hobbies, and volunteer work. Over the years, offenders have also utilized technological advancements (*e.g.*, cameras, telephones, automobiles, video cassette recorders, etc.) to facilitate their sexual interests, needs, and behaviors. Starting in the 1990's, computers, online services, and the Internet have increasingly become points of contact and technological tools for sex offenders. The use of this technology continues to grow and expand. In many ways, however, the offenders utilizing computers and the Internet to facilitate their sexual exploitation of children are more

like the "nice guy" acquaintances who groom the children inside the school house than the "evil predator" strangers who lure them outside on the school yard.

Some may wonder why a discussion of acquaintance molesters would include a section on the use of computers. A "friend" with whom a child regularly communicates on the Internet, but sees for the first time only when they finally meet in person, should be viewed as an acquaintance offender, not a stranger. Like most acquaintance molesters, individuals attempting to sexually exploit children through the use of computer online services or the Internet tend to gradually seduce their targets through the use of attention, affection, kindness, and gifts. They are often willing to devote time, money, and energy to this process. They will listen to and empathize with the problems of children. They may be aware of the music, hobbies, and interests of children. Unless the victims are already engaged in sexually explicit computer conversations and activity, offenders will usually lower any inhibitions by gradually introducing the sexual context and content. Some offenders use the computer primarily to collect and trade child pornography, others also seek online contact with other offenders and children, and some do all of these things.

Children, especially adolescents, are often interested in and curious about sexuality and sexually explicit material and interaction. They will sometimes use their online access to actively seek out such material and contacts. They are moving away from the total control of parents and trying to establish new relationships outside the family. Sex offenders targeting children will use and exploit these characteristics and needs. Children also furnish false information and lie during their online activity. Adolescent children may also be attracted to and lured by online offenders closer to their age who, although not technically "pedophiles," may be exploitive or dangerous.

### Interact with and Solicit Sex with Children

Offenders can use the online computer to troll for and communicate with potential victims with less risk of being identified. The use of a vast, loose knit network like the Internet can sometimes make identifying the actual perpetrator difficult. On the computer, the offender can assume any identity or characteristics he wants or needs and gain access to a large reservoir of potential child victims. Much of the grooming/seduction process can now begin and progress utilizing online text, voice, and visual communication. Although children from dysfunctional families and families with poor communication might be at higher risk for seduction, all children are vulnerable. Older children are obviously at greater risk than younger children. Adolescent boys confused over their sexual orientation are at particularly high risk of such contacts.

By no reasonable definition should an individual with whom a child has regularly communicated online for months be considered a "stranger," even if that individual has lied about his true identity. In the world of the Internet, someone you never met in person is not a stranger, but can be a "bff" (best friend forever). Many offenders are in fact reasonably honest about their identity and some even send recognizable photographs of themselves. They spend hours, days, weeks, and months communicating (including a lot of listening) with children. The child can be indirectly "victimized" through conversation ("e-mail," "chat," "instant messages," "blogs," "cyber-sex," "sexting") and the transfer of sexually explicit information and material.

Through the use of web-cams, offenders can in real-time display sexually explicit behavior to children (exhibitionism) and observe children engaging in suggested sexually explicit behavior (voyeurism). This interaction can be enhanced by digital teleconferencing that allows for online voice and visual participation, even by multiple offenders, in the sexual victimization of children. Such "cyber-sex" can call into questions traditional definitions of child molestation as "hands-on contact. The child can also be evaluated for future face-to-face contact and direct victimization.

Investigators must recognize that many of the children lured from their homes after online computer conversations are not innocents who were duped while doing their homework. Most are normal, curious, rebellious, or troubled adolescents seeking sexual information or contact. Society has to stop focusing on the naive belief that teenagers are "accidentally" getting involved. Many adolescent children go online to deliberately find pornography. Investigation will sometimes discover significant amounts of adult and child pornography and other sexually explicit material on the computer of the child victim. Investigation can also sometimes discover that the child victim has made as many, if not more, misrepresentations as the offender. Most of them have been seduced and manipulated by a clever offender and usually do not fully understand or recognize what they were getting into. The child victim may believe that the offender is a "true love" or rescuer with whom they want to have sex. Even if they do fully understand, the law is still supposed to protect them from adult sexual partners. Consent should not be an issue with child victims even if they are "compliant" (Lanning 2005). Investigators must recognize and deal with these dynamics when interviewing these online child victims.

**Prevention Issues**

Reality about documented cases and child development should be incorporated into awareness and prevention programs intended to keep children safer on the Internet. The reason we protect children and limit their accountability is because they are developmentally immature, not because they are innocent. Children are human. They learn to manipulate their environment from birth. Adolescent children are interested in sex and often engage in high risk behavior. Generally speaking, children less than 12 years of age tend to listen to adults, but do not fully understand what they are saying (*i.e.*, "why can I talk to this stranger but not this other stranger?"); children over 12 years of age tend to better understand, but no longer listen. Many adolescent children believe that "rules are made to be broken." Maybe one reason parents should not trust their teenage children is simply because they are teenagers. To quote from President Reagan, the best strategy may be "trust but verify."

The National Juvenile Online Victimization (N-JOV) Study found that the prevalent image of Internet sex crimes against minors as strangers who are pedophiles and who deceive and lure unsuspecting children into situations where they can be forcibly abducted or sexually assaulted is not accurate. Most offenders in these Internet cases did not deceive their victims about the fact that they were adults who were interested in sexual relationships. The victims in these cases were young adolescents with 99% being age 13 to 17, and none younger than 10. Most victims met and had sex with the adults on more than one occasion and half the victims were described as being in love with or feeling close bonds with the offender. The Study also found that because in most cases the offenders had communicated extensively with victims, both online and off before they actually met in person, it would be misleading to characterize them as

"strangers" to their victims. There was no evidence that the online offenders were stalking or abducting unsuspecting victims based on information they posted at social networking sites. Most offenders were open about their sexual motives in their online communication with youth. (Wolak 2004, Wolak 2008, and Wolak 2009). Using the terminology defined in this publication, they are compliant child victims.

Many children have developed and use online shorthand. Abbreviations such as P911 (my parents are coming), PAW (parents are watching), POS (parent over shoulder), and PIR (parent in room) are used to let people with whom they are communicating online know that their parents are around. This type of behavior should help remind us of the obvious – children often do things that they want to do but their parents do not want them to do. That what it means to be a teenager! Most online child victims take risks on and off line and see the online relationships as romances and sexual adventures. It appears that some of the most risky behavior involves being rude or nasty online, discussing sex online with persons they do not know in person, sending (*i.e.*, sexting) sexy images, engaging in cybersex, and receiving online sexual solicitation (Wolak 2008). Children creating, sending, and receiving sexually explicit images of children (including themselves) also involves serious violations of the law for which they could be prosecuted.

It is easier to prevent things that both parent and child do not want to happen (*i.e.*, forced sex with an evil predator you met online). It is harder to prevent things that the parent does not want to happen, but the child does (*i.e.*, romantic sex or a good time with an exciting adult friend you met online). Public service announcements warning about online dangers occasionally appear on television. Commercials for online sites where you can find the love of your life or your soul mate, however, run all day long. Parents also recognize the problem of asking your children to "do as I say, not as I do." It is hard to expect children to abide by rules for online safety when parents download pornography and disclose private information, exchange e-mail photographs, and travel to meet online "stranger."

Simplistic or unrealistic advice based on the belief that teenagers only accidentally or inadvertently find sexually explicit images online, recommending putting the family computer in the middle of the family room, or asking adolescent children to tell their parents if something or someone online makes them feel uncomfortable is unlikely to have significant impact on the problem. With the computer in the family room, many children will simply use another computer or some portable high tech device to engage in their high risk behavior. It makes no sense to ask children to tell parents only about "unwanted" sexual contacts. They are children. Sexual activity with adults is a problem whether or not it is wanted.

Warning children about online "predators," can communicate a false impression of the nature of the danger. From the potential child victim's perspective, the typical online offender is less like the weirdo stranger at the playground and more like the nice acquaintance who lives in the neighborhood. Making children safer online should rely less on hardware, software, and dire warnings about online predators and more about involvement in their lives, communication, and love.

# INVESTIGATING MULTIPLE-VICTIM CASES

General investigative techniques are applicable in varying degrees to the acquaintance-exploitation cases involving multiple victims. The "big-picture" approach is the key to the successful investigation and prosecution of these cases. Multiple victims corroborated by child pornography, erotica, and other physical evidence make a powerful case likely to result in a guilty plea, no trial, and therefore no child-victim testimony. The techniques noted below apply **primarily** to the investigation of acquaintance-exploitation cases involving multiple victims.

## Understanding the Seduction Process

Most child victims in multiple-victim-exploitation cases were seduced or groomed over time. The seduction process was previously discussed in more detail. True understanding of this process must be incorporated into the investigation of these cases. After understanding the seduction process, the investigator must be able to communicate this understanding to the victim. This is the difficult part. An investigator once contacted me and described what sounded like a classic case involving an acquaintance-seduction sex offender. The investigator stated, however, that his first disclosing victim, a 12-year-old boy, described being gagged and tied up by the offender. While this is certainly possible, it is not typical of such offenders. When asked when and how the victim furnished this information, the investigator admitted that it was after he had asked the boy why he did not scream or fight when the offender abused him sexually.

By asking such questions in this way, the investigator is communicating to the boy that the investigator has no insight into the nature of this crime nor an understanding or acceptance of the subtle seduction of the boy. The investigator is back in the world of dirty old men in wrinkled raincoats jumping out from behind trees. Obviously the investigator did not understand that the molester was probably the boy's best friend who seduced him with attention and affection. The victim realized that the investigator would not understand what happened, and so the boy "adjusted" the story and tried to explain with an excuse that the investigator would accept and understand. The boy was suffering from the "say no, yell, and tell" guilt.

I have given many presentations describing the dynamics of multiple-victim cases and seduction techniques of some child molesters (pedophiles). After many of these presentations, adult male members of the audience have approached me in private and admitted that they were victimized as boys. Most stated they had never before told anyone of their victimization, but were now able to tell because they realized I understood the problem and that they were not the only ones so victimized. The key then to getting child victims who were compliant to disclose their victimization is to communicate subtly to them your understanding of the seduction process without engaging in repetitive, leading, or suggestive interviewing that might damage the reliability and credibility of the information obtained. After the first few victims disclose the others usually come forward more readily. Some individuals, however, may come forward and falsely claim to be victims in order to get attention, forgiveness, or part of a financial settlement in a civil law suit. All allegations must be thoroughly and objectively evaluated and investigated.

Some victims may describe activity that sounds like the grooming process, but then add details about also being drugged, threatened, or brutalized by the same offender. It makes little sense to groom a child over an extended time period if you are going to drug them or force them into sexual activity. Why waste the time? Grooming is a technique used so the offender does not have to use force. As previously mentioned, use of violence is especially risky for acquaintance molesters. Victims may also try to explain their failure to disclose the victimization by claiming the offender threatened to kill them or a loved one. Acquaintance offenders are far more likely to threaten they will kill themselves if the victim tells. In a relationship founded on seduction, the most likely threat is not to use force or violence but to withhold attention and affection or end the relationship. Although anything is possible, these false claims of threats and force are usually caused by shame and embarrassment over what actually happened and the desire to tell interviewers what the socially acceptable version they prefer to hear.

Investigators and prosecutors must understand and learn to deal with the incomplete and contradictory statements of seduced victims of acquaintance molesters. The dynamics of their victimization must be considered. They are embarrassed and ashamed of their behavior and rightfully believe that society will not understand their victimization. Many younger child victims are most concerned about the response of their parents and often describe their victimization in ways they believe will please their parents. Adolescent victims are typically more concerned about the response of their peers. Investigators who have a stereotyped concept of child-sexual-abuse victims or who are accustomed to interviewing younger children molested within their family will have a difficult time interviewing adolescents molested in a sex ring. Many of these victims will be troubled or even delinquent children from dysfunctional homes. Such victims should not be blindly believed, but should not be dismissed because the accused is a pillar of the community and they are delinquent or troubled. Such allegations should be objectively investigated.

When attempting to identify potential victims in a multiple-victim-exploitation case, I recommend trying to start with victims who are about to or have just left the offender's "pipeline." The victim most likely to disclose would be one who has just left the ring and has a sibling or close friend about to enter the ring. The desire to protect younger victims from what they have endured is the strongest motivation for overcoming their shame and embarrassment. The next best choice would be a victim who has just entered the "pipeline."

Before beginning the interview the investigator must understand that the victim may have many positive feelings for the offender and even resent law-enforcement intervention. Because of the bond with the offender, victims may even warn the offender. Even the occasional victim who comes forward and discloses may feel guilty and then warn the offender. They may even return to law enforcement with a hidden tape recorder to try to catch the investigator making inappropriate comments or utilizing improper interview techniques. Reluctance to disclose may be more due to affection for the offender than to fear of the offender.

Time must be spent attempting to develop a working relationship with the victim. The investigator must be able to discuss a wide variety of sexual activity, understand the victim's terminology, and not be judgmental. Not being judgmental, as with developing rapport, may be

much more difficult with a delinquent adolescent who actively participated in his victimization. Investigators often nonverbally communicate their judgmental attitude unknowingly through gestures, facial expressions, and body language. The victim must come to understand that any truthful answer is acceptable, including "because I enjoyed it."

In interviewing victims of acquaintance sexual exploitation, law enforcement should consider – in their own minds – pretending that the victim is a subject or suspect, and expect the victim to deny or minimize his or her acts. Some victims will continue to deny their victimization no matter what the interviewer says or does. Some children even deny victimization that the offender has admitted or other evidence discloses. Some will make admissions but minimize the quality and quantity of the acts. Like offenders, victims often describe activity (*e.g.,* wrestling, back rub, and horsing around) that gives them plausible deniability concerning its sexual nature. They may minimize their compliance and maximize the offender's involvement by claiming he drugged them, threatened them, had a weapon, or had even abducted them. Of course some of these allegations may be accurate and should be investigated. They are, however, not typical of acquaintance-exploitation cases. Violence is most likely used to prevent disclosure. Sadistic sex offenders may also use violence during sex, but this is relatively rare in cases involving seduction. As previously discussed, these potential inaccuracies in the details of the allegations of seduced victims may explain some of the inconsistencies between the alleged "what" and the suspected "who."

The investigator must communicate to the victim that he or she is not at fault even though the victim did not say no, did not fight, did not tell, initiated the sex, or even enjoyed it. When the victim comes to believe that the investigator understands what he experienced, he or she is more likely to talk. Victims often reveal the details little by little, testing the investigator's response. The investigator must recognize and sometimes allow the victim to use face-saving scenarios when disclosing victimization. For example such victims might claim they were confused, tricked, asleep, half-asleep, drugged, drunk, or tied up when they were not. Adolescents, who pose special challenges for the interviewer, use these face-saving devices most often.

With compliant child victims, interviewers must be especially careful of certain "why" questions (*i.e.,* "Why didn't you tell right away?" "Why didn't you resist?" "Why are you smiling in the picture?") and other questions that imply judgment and an anticipated response (*i.e.,* "Did he threaten you?" "Were you scared?" "Is it hard to remember such terrible things?"). Victims may also communicate that the offender wanted to perform certain sexual acts that they found unpleasant and when they refused the offender stopped. Investigators and prosecutors must now be prepared to deal with the fact that they may have a sex crime victim who did not engage in unwanted sex. If the victim had just said "no" there would have been no crime. What kind of victim is this? The answer is a seduced child victim whose "consent" to have sex with adults is not supposed to matter. The investigator must accept the fact that even if such victims do disclose information it is likely to be incomplete, minimizing their involvement and acts. Some of these victims simply do not believe they were victims. With compliant child victims, distorted and varying details in their disclosures not only do not necessarily mean the allegations are false but can be almost corroborative of their validity.

In the absence of some compelling special circumstance, the interview of a child possibly seduced by an acquaintance molester should **never** be conducted in the presence of parents. The presence of the parent increases the likelihood that the child will just deny or give the socially or parentally acceptable version of the victimization. This is especially true of younger victims. Investigators should also consider unannounced interviews of victims of acquaintance molesters.

If all else fails the investigator can try the no-nonsense approach. No matter what the investigator does, most adolescent boy victims will deny they were victims. It is important, therefore, that as many potential victims as legally and ethically possible are interviewed. It is also possible that some troubled teenagers may exaggerate their victimization or even falsely accuse individuals. Allegations must be objectively investigated considering all possibilities. After disclosing, some victims will later recant or change their stories.

The offender may also continue to manipulate the victims after investigation and disclosure. The offender may appeal to the victim's sympathy. He may make a feeble attempt at suicide to make the victims feel guilty or disloyal. Some offenders may threaten the victims with physical harm or disclosure of the blackmail material. Some offenders may bribe the victim and his family. Even after they disclose and testify in court, some victims then recant and claim they perjured themselves. Although in some cases the recantation may be valid, it is most likely the result of blackmail, feelings of guilt about the offender being in prison, or shame over their behavior.

Some victims in acquaintance-child-exploitation cases disclose incomplete and minimized information about the sexual activity. This creates significant problems for the investigation and prosecution of such cases. For instance when the investigator finally gets a victim to disclose the exploitation and abuse, the victim furnishes a version of his victimization that he or she swears is true. Subsequent investigation then uncovers additional victims, child pornography, or computer chat logs – directly conflicting with the first victim's story. A common example of this is that the victim admits the offender sucked his penis, but denies that he sucked the offender's penis. The execution of a search warrant then leads to the seizure of photographs of the victim sucking the offender's penis. Additional victims may also confirm this, but then lie when they vehemently deny that they did the same thing.

The allegations of multiple victims often conflict with each other. Each victim tends to minimize their behavior and maximize the behavior of other victims or the offender. Some victims continue to deny the activity even when confronted with the pictures. Today investigators must be especially careful in computer cases where easily recovered evidence (*e.g.,* chat logs, records of communication, and visual images) from both the victim and the offender may directly contradict the socially acceptable version of events that the victim is now giving.

Allegations involving multiple acts, on multiple occasions, over an extended period of time must be evaluated in their totality and context. Cases involving long-term sexual contact with compliant child victims should not be assessed and evaluated by comparisons to cases involving isolated, forced sexual assaults. Indicators suggesting a false allegation in a typical rape case have little application to the evaluation of most acquaintance child molestation cases, especially those involving repeated access and prolonged sexual activity. Such child molestation

cases are very hard to classify as either a valid or false allegation. Victim claims may include allegations that appear to be false, but that does not mean the case can be labeled in totality as "a false allegation." In my experience, many valid claims of child sexual molestation, especially those by compliant child victims, involve the delayed disclosures, inconsistencies, varying accounts, exaggerations, and lies often associated with false allegations. Inconsistencies in allegations are significant but can sometimes be explained by factors other than that the allegation is false. What is consistent and logical in these circumstances must be based on experience and knowledge of cases similar to the case being evaluated.

Any indicators of a potential false claim must be applicable to the type of case in question and not based on cases involving one time, violent sexual assaults. There is a difference between an unsubstantiated/unproven allegation and a false allegation. There may be many reasons to believe that the allegations are not accurate and should not sustain a conviction in court beyond a reasonable doubt, but that does not mean that the allegations of sexual victimization can be labeled as totally "false." Labeling an allegation as false should mean that NOTHING of a criminal/sexual nature occurred between the child victim and the alleged adult offender at any time.

### Understanding the Preferential Offender

Preferential sex offenders (*see* Lanning, 2009 for more complete discussion) may be "pillars of the community" and are often described as "nice guys". They almost always have a means of access to children (*e.g.,* marriage, neighborhood, occupation). Determining their means of access helps identify potential victims. Investigation should always verify the credentials of those who attempt to justify their acts as part of some "professional" activity. It must be understood, however, that just because an offender is a doctor, clergy member, or thera-pist, for example, does not mean he could not also be a child molester.

As previously stated, because the molestation of children is part of a long-term persistent pattern of behavior, preferential child molesters are like human evidence machines. During their lifetime they leave behind a string of victims and collection of child pornography and erotica. The preferential child molester, therefore, can be thoroughly investigated and corroborative evidence easily found if investigators understand how to recognize him and how he operates – **and if their departments give them the time and resources**.

Men sexually attracted to young adolescent boys are the most persistent and prolific child molesters known to the criminal-justice system. Depending on how one defines molestation, they can easily have dozens if not hundreds of victims in a lifetime. They usually begin their activity when they are teenagers themselves and continue throughout their lives as long as they are physically able.

Many pedophiles spend their entire lives attempting to convince themselves and others that they are not evil sexual perverts, but good guys who love and nurture children. That is a major reason why they do such things as join organizations where they can help troubled children and volunteer to search for missing children. Because so many of them have successfully hidden their activities for so long, when identified and prosecuted they try to

convince themselves that they will somehow continue to escape responsibility. This is why they often vehemently proclaim their innocence right up to the time of their trial. If, however, the investigator and prosecutor have properly developed the case, preferential offenders almost always change their plea to guilty. Investigators and prosecutors should also be aware of offenders too eager to plead guilty. They may be hiding much more extensive or serious behavior that they hope will not be discovered by additional investigation.

# Appendix I:  References

Atkinson, R.K. (1939). *The boys' club*. New York, NY: Association Press.

Goldstein, S.L. (1984). Investigating child sexual exploitation. In *FBI Law Enforcement Bulletin*, 53, 1, pp. 22-31.

Illinois Legislative Investigating Commission (1977). *Sexual exploitation of children: a report to the Illinois General Assembly*. Chicago, IL.

Lanning, K.V. & Burgess, A.W. (1984) Child pornography and sex rings.  In *FBI Law Enforcement Bulletin*, 53, 1, pp. 10-16.

Lanning K.V. (2005). Compliant child victim: confronting an uncomfortable reality.  In Quayle, E., Taylor, M., (Eds.), *Viewing child pornography on the Internet*. (pp. 49-60) Dorset, United Kingdom: Russell House Publishing.

Lanning, K.V. (2009).  *Child molesters: A behavioral analysis* (5th *ed.*). Alexandria, VA: National Center for Missing & Exploited Children.

van Dam, C. (2006). *The socially skilled child molester*. Binghamton, NY: The Haworth Press.

Wolak J, Finkelhor, D, Mitchell K. (2004). Internet-initiated sex crimes against minors: implications for prevention based on findings from a national study.  In *Journal of Adolescent Health*; 35: 424.e11-424.e20.

Wolak J, Finkelhor, D, Mitchell K. (2004). *Child-pornography possessors arrested in internet-related crimes*. Alexandria, VA: National Center for Missing & Exploited Children.

Wolak J, Mitchell K, Finkelhor, D. (2006). *Online victimization of youth: five years later*. Alexandria, VA: National Center for Missing & Exploited Children.

Wolak J, Finkelhor, D, Mitchell K, & Ybarra, M. (2008). Online "predators" and their victims. In *American Psychologist*, 63, 2, pp. 111-128.

Wolak J, Finkelhor, D, & Mitchell K. (2009). *Trends in arrests of "online predators."* University of New Hampshire Crimes Against Children Research Center Report.

Wolf, D.L. (1982). *Child sexual abuse*. Big Brothers/Big Sisters of America.

# Appendix II: Appellate Case Decisions

In the following cases, the expert testimony of Kenneth V. Lanning concerning various aspects of the behavioral analysis set forth in this publication was affirmed on subsequent appeal:

- *United States versus Mervyn Harold Cross*, #84 192 CR T 17 (A) Middle District of Florida B 3/11/86, Affirmed - 928 F. 2d 1030 (11th Cir 1990)

- *United States versus Richard Romero*, #96-CR-167 Northern District of Illinois B 6/17-18/97 & 10/6/97, Affirmed - 189 F. 3d 576 (7th Cir 1999)

- *State of Texas versus Eric Charles Nenno*, Criminal Case #689920, 208th State District Court, Houston, Texas - 1/29/96, Affirmed – 970 S.W. 2d 549 (1998)

- *State of Texas versus Rudolph Edward Kos*, #F-97 32232 Dallas, Texas B 3/30/98, Affirmed - 15 S.W. 3d 633

- *United States versus Kenneth Long*, #99-182, District of Columbia B 11/10/99 & 12/99, Affirmed - 328 F.3d 655 (D.C. Cir. 2003)

- *United States versus Scott Hayward*, #02-63 Western District of Pennsylvania B 7/29/02, Affirmed - 2004 WL 405936 (3rd Cir. 2004)

- *United States versus Sergeant Michael B. Hays*, U.S. Army, General Court Martial, Grafenwoehr, Germany - 6/7/00, Affirmed - 62 M.J. 158 (U.S. Armed Forces 2005)

- *United States versus Raymond Davenport*, Criminal Case #EV 03-027-CR-01-Y/H, Southern District of Indiana - 7/19/04, Affirmed - 149 Fed. Appx. 536 (7th Cir. 2005)

- *United States versus Ronald Forrest*, Criminal Case # AW-03-0458, United States District Court, District of Maryland B 5/13/04, Affirmed - 429 F. 3d 73 (4th Cir 2005)

- *State of Connecticut versus John Sorabella*, Docket # HHB-CR00-188041 & 88042 Superior Court B New Britain Judicial District, New Britain, Connecticut - 2/7/06, Affirmed B 277 Conn.155 (Connecticut Supreme Court)

- *State of Florida versus Gervasio Torres, Jr.*, Criminal Case No. 03CF012679A02, Circuit Court of the Fifteenth Judicial Court Palm Beach County, Florida 4/20/05, Affirmed- 4th District Court of Appeal of Florida (1/7/09)