# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

UNITED STATES OF AMERICA  )
)
)
)
v.                         )            CRIMINAL No. 09-144-P-H
)
JAMES RAYMOND,             )
)
DEFENDANT

## MEMORANDUM DECISION AND ORDER ON
## DEFENDANT'S MOTION IN LIMINE

On March 18, 2010, by oral order, I **GRANTED** the defendant James Raymond's motion in limine to exclude prosecution expert Kenneth V. Lanning's testimony. I ruled that Lanning's anticipated testimony about the behavioral patterns of child molesters and their victims—as it might be used in this case to suggest the defendant's criminal intent or the truthfulness of the victim's testimony—does not satisfy the fit or reliability requirements of Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). Oral Order Granting Def.'s Mot. in Limine Re: Test. of Kenneth Lanning (Docket Item 79).[1] I write to provide a full explanation of my oral ruling.

---

[1] I left open the possibility of rebuttal testimony if the defendant challenges the veracity of the victim's testimony at trial because of delays or inconsistencies in her reporting the defendant's alleged behavior. See the final substantive paragraph of this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Case*

James Raymond has been indicted on two counts of transporting a minor across state lines with the intent of engaging in illegal sexual activity. 18 U.S.C. § 2423(a).  Indictment as to James Raymond (Docket Item 3).  The case is scheduled for trial in April 2010.  At oral argument on March 12, 2010, Raymond did not dispute that he travelled with an eleven-year-old girl and her sister from Maine to New Hampshire on two occasions in the summer of 2007. The central question at trial will be his intent in making those two trips.[2]

### *The Government's Expert Designation*

In January 2010, the government informed Raymond's lawyer that it intended to offer expert testimony from Kenneth V. Lanning, a thirty-year veteran of the FBI (including twenty years in the Behavioral Science Unit and National Center for the Analysis of Violent Crime at Quantico).  Letter from Craig M. Wolff to Richard L. Hartley at 1 (January 11, 2009) (Ex. 1 to Def.'s Mot. for Discovery (Docket Item 57) (Docket Item 57-1).  The government said that it anticipated that Lanning would testify, first, about child molesters' behavioral patterns and the "grooming or seduction process" that molesters use to gain access to victims and, second, about certain characteristics of "compliant child victims."  Id. at 2.  At that time, the government stated that Lanning's opinions were outlined in two publications, but it did not provide a detailed statement identifying specific opinions and their bases.  It did note

---

[2] When I ruled orally, I did not know what, if anything, allegedly occurred during the trip.  The government's trial brief filed later says that the defendant touched the eleven-year-old's breasts and buttocks during one of the trips.  Gov't. Tr. Br. at 2 (Docket Item 84).

that several circuit courts had upheld the admissibility of Lanning's testimony. Id.

In response, Raymond moved to exclude Lanning's testimony under Federal Rule of Evidence 702. He also filed a Motion for Discovery (Docket Item 57) for further detail about Lanning's opinions. I granted the Motion for Discovery. See Order on Def.'s Mot. for Discovery (Docket Item 61).

The government then supplemented its expert designation. Letter from Craig M. Wolff to Richard L. Hartley (February 25, 2010) (Ex. 2 to Gov't's Opp'n to Def.'s Mot. in Limine Re: Test. from Kenneth Lanning (Docket Item 65)) (Docket Item 65-2). In its supplement, the government stated that Lanning would provide "general 'education' testimony" about the behavior of child molesters and their victims based on his book, CHILD MOLESTERS: A BEHAVIORAL ANALYSIS FOR LAW-ENFORCEMENT OFFICERS INVESTIGATING THE SEXUAL EXPLOITATION OF CHILDREN BY ACQUAINTANCE MOLESTERS (4th ed. 2001) and on his article, "Grooming" and Seduction of Child Victims of Sexual Exploitation (undated). Id. at 1. The book is available for downloading on the internet from the National Center for Missing and Exploited Children; the government attached a copy of the article to its memorandum in opposition. Id.

Specifically, the government said that at trial Lanning would: (1) "contrast acquaintance molesters with other types of sexual abusers such as stranger or intrafamilial abusers"; (2) "discuss the fact that acquaintance molesters are typically 'nice guy offenders,' often authority figures, who tend to find and control their victims through the grooming or seduction process"; (3) describe the "methods by which offenders pick their victims, including

3

identification of the prospective victims' interests and vulnerabilities; [t]he 'seduction' of victims' parents by gaining their trust and confidence; [t]he offender's use of attention, affection, gifts and financial incentives as part of the seduction process; and [t]he lowering of inhibitions through activities such as cuddling, tickling, etc."; (4) discuss "how grooming often results in a greater likelihood of a victim's cooperation, a lower likelihood of disclosure, and greater likelihood of continued access to the victim"; and (5) discuss the characteristics of testimony from "compliant" victims. Id. at 1-2. The government emphasized that Lanning would *not* testify about any of the evidence in the defendant Raymond's case and that he would not interview any of the government's witnesses. Id. at 1.

On March 12, 2010, I heard oral argument from the parties on the defendant's motion to exclude Lanning's testimony. On March 18, in a ruling from the bench, I **GRANTED** the defendant's motion. I then had the Clerk's Office inform the lawyers that I would issue this written opinion to explain my decision more fully.

<strong>ANALYSIS</strong>

### The Proposed Testimony

The government says that Lanning's proposed testimony will help the jury[3] in three ways: giving the jury a basis to infer that Raymond made the two trips with criminal intent; giving the jury a basis to infer that the child victim's

---

[3] At the time of my oral ruling, a jury trial was imminent. Now, Raymond has waived jury trial, Def.'s Waiver of Right to Trial by Jury (Docket Item 81), the government has consented, and I have accepted the waiver. I will continue to refer to jury trial, however, the nature of the case at the time of my ruling.

testimony is truthful; and rebutting any defense case that any of the victim's behavior shows untruthfulness or that certain of Raymond's actions show innocence.

First, the government argues that Lanning's opinions should be provided to the jury because "understanding the behavior of child sex offenders tends to make more or less probable the fact that, given specific evidence of his behavior, the [defendant Raymond] acted with the requisite intent." Gov't Opp'n at 4. Lanning will base this "education testimony regarding the characteristics and modus operandi of acquaintance sex offenders generally" on "patterns of behavior involving the sexual victimization of children" that Lanning has been "able to document" by reviewing and analyzing thousands of cases of child abuse as an FBI agent and a private consultant. Id. at 7. In other words, Lanning will testify that certain behavior patterns (presumably the same as, or close to, what the testimony will reveal about Raymond's behavior) are characteristic of adults who intend to molest children.

Second, the government says that Lanning will "testify regarding characteristics of compliant victims and offer explanations for why minor victims may not immediately report abuse or report it in an incomplete or contradictory manner. This testimony . . . is necessary to provide jurors with information necessary to evaluate [the victim's] behavior." Id. at 6 n.5. In other words, Lanning's testimony will buttress the truthfulness of the child victim's expected testimony at trial about Raymond's behavior toward her.

Third, the government says that Lanning's testimony will rebut any defense case that the victim's behavior shows that her testimony is false or that

Raymond's behavior shows that he is innocent.  In addition to what I describe in the previous paragraph about Lanning's testimony on victim behavior, the government says:

> [the victim] and other witnesses will describe acts by [Raymond] that could be susceptible to innocent explanations. . . . [Raymond] will almost assuredly argue that he took all of these actions with purely innocent intent. Through Lanning's testimony, however, the jury will also learn about the grooming process conducted by acquaintance sex offenders, and armed with this knowledge, will be able to evaluate [Raymond's] actions. Lanning's testimony will, therefore, play an important role in educating the jury about patterns of behavior likely unfamiliar to them.

Id. at 5-6.

I exclude outright the proposed testimony in the first two categories, i.e., to provide a basis for determining the defendant's intent and to suggest that characteristics of the victim's reporting behavior show truthfulness.  I reserve decision on whether to permit Lanning to testify in rebuttal if the defense challenges the victim's veracity based upon the reporting behavior.

**Applicable Standards**

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The Rule provokes two main inquiries.  First, there is the question of "fit":  will the knowledge in question "assist the trier of fact to understand the evidence or to determine a fact in issue"?  <u>Daubert</u>, 509 U.S. at 591 ("'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.").  Second, does the testimony meet the three numbered standards of the Rule, which focus on reliability?

Expert testimony need not be based on hard science.  Rule 702 also permits testimony by "skilled" witnesses based on experience because "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702 Adv. Comm. Notes (citation omitted); <u>see also</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999).  But Rule 702 does not contemplate admission of "opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  <u>Gen. Elec. v. Joiner</u>, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); <u>see also</u> <u>United States v. 33.92356 Acres of Land</u>, 585 F.3d 1, 7 (1st Cir. 2009) ("[T]rial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." (quoting <u>Ruiz-Troche v. Pepsi Cola of P. R. Bottling Co.</u>, 161 F.3d 77, 81 (1st Cir. 1998)).

If a witness does rely "solely or primarily on experience, [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 Adv. Comm. Notes.  A trial court evaluating

proposed testimony based on experience (no less than when assessing opinions based on hard science) must ensure that an expert has used reliable principles and methods and has reliably applied them to the facts of the case.  Id. (citing Daubert, 509 U.S. at 595).  "[I]t will be appropriate for the trial judge to ask, for example, how often an . . . expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant . . . community."  Kumho, 526 U.S. at 151.

In general, the Advisory Committee recommends that a trial court, in performing its assigned gate-keeping role, assess whether an expert: (1) "propos[es] to testify about matters growing naturally and directly out of research [he has] conducted independent of the litigation, or whether [he has] developed [his] opinions expressly for purposes of testifying"; (2) "has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (3) "has adequately accounted for obvious alternative explanations"; (4) "is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (5) practices in a field "known to reach reliable results for the type of opinion the expert would give."  Fed. R. Evid. 702 Adv. Comm. Notes (citations omitted).

These questions complement the list of factors for analyzing the admissibility of expert testimony that the Supreme Court recognized in Daubert.  Daubert characterized Rule 702's requirement that the expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue" as a requirement of relevance or "fit" in the sense of having "a valid scientific connection to the pertinent inquiry."  Daubert, 509 U.S. at 592.

8

On Rule 702's concern for reliability, Daubert listed the following non-exhaustive list of factors:  "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error;  and (4) general acceptance in the relevant scientific community."  Granfield v. CSX Transp., Inc., 2010 U.S. App. LEXIS 5299, at *25 (1st Cir. Mar. 12, 2010) (quoting Daubert, 509 U.S. at 593-95).  Kumho emphasized that the list is not an exhaustive list and must be adjusted to the expertise in question.  526 U.S. at 150 ("We can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert . . . .  Too much depends upon the particular circumstances of the particular case at issue.").

***Applying the Standards***

The government has not provided a statement providing specific bases for Lanning's opinions.  Neither has it provided, for example, an affidavit from Lanning explaining how he drew on his experience to develop his account of the behavioral characteristics of child victims or of child molesters.  Instead, following my grant of the defendant's motion for further discovery about the expert testimony, the government points me to Lanning's book, CHILD MOLESTERS: A BEHAVIORAL ANALYSIS, and Lanning's article, "Grooming" and Seduction of Child Victims of Sexual Exploitation (Ex. 3 to Gov't Opp'n) (Docket Item 65-3). I have therefore consulted only those two sources. I turn now to Daubert's and Rule 702's focus on both reliability and fit.

9

### (a)        Reliability

Lanning wrote his book "for law enforcement officers investigating the sexual exploitation of children by acquaintance molesters."[4]  The book provides many of his opinions, but it does not give the facts or data Lanning used.  Nor does it demonstrate that the principles and methods he used in arriving at his opinions for investigative techniques are reliable for the purposes of admitting them as evidence in court under Rule 702.  Lanning states that the information he provides is "based on my education, training, and more than 27 years of experience studying the criminal aspects of deviant behavior and interacting with investigators and prosecutors."  CHILD MOLESTERS at 1.  He states that his "database is the thousands of cases on which I have consulted or studied" and that the "validity" of his opinions is "the fact that its application has worked for all these many years."  Id.  Lanning assures his reader, "I have great confidence in its behavioral accuracy and reliability."  Id.

Statements like these permit no meaningful evaluation of Lanning's facts or data or the reliability of Lanning's opinions, and I find no other statement in the book directed to that end.[5]  Even if a witness relies "solely or primarily on experience, [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 Adv. Comm.

---

[4] This language is the subtitle.

[5] Lanning adds the troubling statement: "Although I understand that data is not the plural of anecdote, the information and opinions are based primarily on the totality of my acquired knowledge and expertise."  CHILD MOLESTERS at 1.  How under Rule 702, Daubert, and Kumho, can a fair assessment be made of the data used or the reliability of an opinion when they are based upon a statement like that?

Notes.[6]  All that I have on this record is the expert's "ipse dixit" against which General Electric v. Joiner warned.  522 U.S. at 146.

Moreover, Lanning seemingly disavows the reliability of his manual for legal use: "Its legal acceptance and application . . . must be carefully evaluated by investigators and prosecutors based on departmental policy, rules of evidence and current case law.  This publication is intended to be a *practical* behavioral analysis with application to the criminal justice system."  CHILD MOLESTERS at 1 (emphasis added).  Similarly, he writes:

> [T]his typology is not intended to be used in a court of law to **prove** that someone is guilty of child molestation because he or she fits a certain 'profile.'  It would be inappropriate and improper to claim that because someone has certain traits and characteristics, we know with certainty that he or she is a child molester and should, therefore, be convicted.  The level of proof necessary to take action on information is dependent on the consequences of that action.  The level of proof necessary to convict somebody in a court of law and incarcerate him is very high proof, beyond a reasonable doubt.

Id. at 45 (emphasis in original).  In other words, Lanning's principles and procedures are useful for law enforcement investigators gathering evidence that might later be used in court, but not of evidentiary quality themselves.[7]  That is an almost complete disclaimer of testimonial reliability.

---

[6] Under Daubert, I do not evaluate whether Lanning reaches correct conclusions, only whether his principles and methodology are reliable.  Daubert, 509 U.S. at 595 ("The focus . . . must be solely on principles and methodology, not on the conclusions that they generate.").

[7] Likewise, "[t]he use of this technique or typology is appropriate for evaluating allegations, developing interviewing strategies, addressing staleness of probable cause, assessing prior and subsequent like acts, educating juries, comparing consistency, *and any additional evidence obtained from applying this typology can hopefully be used in court.*"  CHILD MOLESTERS at 45 (emphasis added).  I discuss "educating juries" later, when I consider the jury's use of Lanning's principles.

The preceding quotations are all from Lanning's book, but no additional information about reliability, or the methodology that Lanning has used for reaching the opinions he promotes, is provided in the Lanning article on how child molesters seduce their victims. In his "grooming" article, Lanning repeatedly describes what *many* offenders or *some* victims are *more likely* or *less likely* to do or *tend* to do or *usually* do. For example, he writes, "Offenders who prefer younger child victims are more likely to first 'seduce' the victim's parents to gain their trust and obtain increased access to the potential victim." Grooming at 13. He also states that "[i]n my experience, many valid claims of child sexual molestation, especially those by compliant child victims, involve the delayed disclosures, inconsistencies, varying accounts, exaggerations, and lies often associated with false allegations.'" Id. at 30. Nowhere does Lanning cite an objective benchmark for these frequencies or comparisons. What is "more likely"? Fifty-one percent? How many is "many"? How few is "some"? What is the error rate for Lanning's behavioral generalizations? Can Lanning's opinions be tested or challenged in any objective sense? Nowhere do I see any discussion of false positives. How many cases has Lanning found where people who possess all the characteristics he describes nevertheless turn out to be innocent or where victims who behave as he describes turns out to be lying? Has he even looked for such examples? For all I can tell, that number may be more, fewer, or the same as, the thousands of cases he says that he has investigated where a defendant turned out to be guilty or where a victim turned out to be telling the truth. And are these rules of exclusion, or only of inclusion? For example, Lanning describes what the "grooming or seduction

12

process *usually* consists of." Id. at 13 (emphasis added).  But what if a defendant fails to do one of the things that Lanning's child molester would *usually* do?  Can the defendant then argue to the jury that he must therefore *not* have been grooming a child?[8]

I conclude that for courtroom evidentiary purposes, as far as this record shows, Lanning's categorization of behavioral characteristics of child molesters and child victims is the "subjective, conclusory approach" that cannot be "reasonably assessed for reliability" under Rule 702.  Fed. R. Evid. Adv. Comm. Notes.[9]

**(b)     *Fit***

The government wants to present to the jury Lanning's testimony about (1) "the characteristics of adults who sexually victimize children and methods they use to control their victims, including the grooming or seduction process," Letter from Wolff to Hartley at 1 (Feb. 25, 2010); and (2) "characteristics of compliant victims and . . . explanations for why minor victims may not immediately report abuse or report it in an incomplete or contradictory

---

[8] See, e.g., United States v. Powers, 59 F.3d 1460, 1472 (4th Cir. 1995) (excluding expert testimony that a defendant did not match the profile of a "fixated pedophile").  In Powers, the appellant, who had been convicted of raping his daughter, argued that the trial court erred by excluding testimony that the appellant did not match a psychological profile exhibited by forty percent of incest abusers.  Id.  The Fourth Circuit held that the appellant could not show a "substantial link between the expert testimony and his theory of defense":  "To be relevant, this testimony must show, in a very real way, that because [the defendant] did not share a characteristic common to a large minority of incest perpetrators, he was less likely to be an incest perpetrator himself."  Id.

[9] Notably, Lanning does not assert that Raymond has some mental condition that predisposes him to child molestation.  Nor does Raymond offer psychological testimony that he has no sexual interest in underage females.  See, e.g., United States v. Robinson, 94 F. Supp. 2d 751 (W.D. La. 2000) (admitting, after Daubert analysis, psychologist's testimony based upon Abel Assessment for Sexual Interest); Powers, 59 F.3d at 1471 (rejecting, after Daubert analysis, defendant's attempt to use a penile plethysmograph test to show lack of pedophilic characteristics).

manner," Gov't Opp'n at 6 n.5.  In addition to my conclusion that the Lanning opinions fail the reliability test, I also conclude for the following reasons that the government has not established that the opinions it plans to offer from Lanning's book and article would reliably assist a jury in understanding the evidence or determining a fact in issue.

In his book, Lanning says that "there are *some* child molesters who *tend* to engage in highly predictable and recognizable behavior patterns." CHILD MOLESTERS at 45 (emphasis added).  But he concedes that "there is not one 'profile' that will determine if someone is a child molester." Id.  He acknowledges the "difficulty of attempting to put complex human behavior into neat categories," id. at 31, and that "[i]t would be inappropriate and improper to claim that because someone has certain traits and characteristics, we know with certainty that he or she is a child molester," id. at 45.[10]  But he suggests that a jury, educated by an expert like him, nevertheless could decide "how" his typology applies in a particular case, "if it applies, and if the evidence constitutes proof beyond a reasonable doubt." Id.

How the jury is supposed to do this is a mystery, because the government does not intend to have Lanning explain how his theories should apply to the facts of this case.[11]  Lanning himself says that even "investigators,

---

[10] Profile evidence is often highly problematic.  See United States v. Gillespie, 852 F.2d 475, 479 (9th Cir. 1988) (holding that the expert testimony about the typical characteristics of child molesters was impermissible propensity evidence); United States v. Forrest, 429 F.3d 73, 81 (4th Cir. 2005) (finding the admission of profile evidence through Lanning to be "troubling").

[11] I recognize that over a decade ago, a federal prosecutor proposed to have Lanning use his principles and methods to testify about a defendant's actual intent.  See United States v. Romero, 189 F.3d 576, 582 (7th Cir. 1999).  When the defense objected that the testimony would violate Rule 704(b), which prohibits expert testimony on a mental state or condition that
*(continued next page)*

social workers, and prosecutors frequently do not take the time to adequately evaluate offender patterns of behavior" with the result that "[s]plit second decisions and stereotypes often determine how an alleged perpetrator is classified and investigated." Id. at 31.  In other words, Lanning recognizes that even experienced investigators have difficulty using his profiles and need to apply his typology with great care.  Yet somehow, a lay jury without guidance is expected to apply his analyses reliably to the facts of a case in determining guilt.  One cannot escape the Rule 702 requirement that the expert apply his principles and methods *reliably* to the facts of the case by simply leaving it to a lay jury to make the application.[12]

Lanning's testimony about behavioral patterns or characteristics of child molesters, if used to suggest the defendant's intent in this case, not only fails the reliability test, but also carries the severe risk of unfair prejudice under Rule 403.  Lanning himself may be careful in how he uses his opinions and profiles, and he may try to educate law enforcement investigators to proceed

---

is an element of the crime charged, the government then limited Lanning's testimony to the methods and techniques that child molesters employ without commenting on the actual defendant.  Id.  That narrower offer of Lanning's testimony appears to have been followed in subsequent cases.  See, e.g., United States v. Hayward, 359 F.3d 631, 637 (3d Cir. 2004).

[12] The Advisory Committee observes that "it might . . . be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case.  The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles.  For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." Fed. R. Evid. 702 Adv. Comm. Notes.  The examples given by the Advisory Committee are principles of thermodynamics or bloodclotting or how financial markets respond to corporate reports.  Id.  Those are rules and principles describing widely recognized and highly predictable and verifiable phenomena.  But this is not a case where, for example, information about how long it takes blood to clot might be used by a jury in assessing the timeline for a murder, or where knowledge that stock prices go down when it is revealed that a company's previous financial reports were exaggerated can be used by a jury in deciding whether fraud has affected stock prices.

with care, but a jury may make the quick and unjustified jump from his expert testimony about behavioral patterns to guilt in a particular case that shows similar patterns.  It is true that jurors regularly are counseled to use their common sense, but introducing the Lanning testimony to a jury invites a toxic mixture of purported expertise and common sense.  As the First Circuit has recognized for different expert testimony, "[b]y appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged." United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994) (citation omitted).

The "grooming" article also leads me to conclude that many of Lanning's opinions are actually common sense observations that the government can simply argue in closing.  "Expert" testimony about matters of common sense is not helpful to a jury and carries the risk of unfair prejudice that I have just mentioned.  In Montas, the First Circuit quoted approvingly a Fourth Circuit statement that "expert testimony is unfairly prejudicial 'when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense.'"  Id. (quoting Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986).[13]  That is precisely the risk here.

For example, with regard to "nice guy" offenders, Lanning writes, "Being 'nice' has little to do with being a child molester except that it increases the

---

[13] As Judge Gottschall has commented, Lanning's "grooming theory," particularly in circumstances where an adult has genuine affection for a child, can "foist[ ] a damning teleology on a series of actions each of which might have been motivated by a variety of ends or *no ends at al* . . . radically simplif[ying] the mess of . . . competing feelings, urges, and needs over the course of [a] relationship into the neat dichotomy of victim and predator."  United States v. Burns, 2009 U.S. Dist. LEXIS 100642, at *14-15 (N.D. Ill. Oct. 27, 2009) (discussing Lanning's testimony) (emphasis added).

likelihood of repeatedly committing the crime and getting away with it.  A desire to work with or help children and an ability to relate to them does not necessarily mean someone is a child molester, but it does not mean someone is not."  <u>Grooming</u> at 9.  "[T]he fact is that **any** child can be groomed by **any** reasonably nice adult with interpersonal skills."  <u>Id</u>. at 13 (emphasis in original).  Those observations are hardly rocket science.  A jury in 2010 does not need expert testimony to help it understand that not every child abuser is "'a dirty old man in a wrinkled raincoat' who snatches children off the street as they wait for the school bus" (the Seventh Circuit's view of what juries believed in 1999).  <u>See</u> <u>United States v. Romero</u>, 189 F.3d 576, 584 (7th Cir. 1999).  Today's news unfortunately is replete with stories of child sexual abuse involving priests and pastors, teachers and doctors, family members, and, in fact, almost every kind of trusted and seemingly trustworthy person.

 And as for "grooming," Lanning explains that he has in mind a totally familiar concept:  "I . . . prefer the term *seduction* because it is better known and more understandable.  These offenders seduce children much the same way adults seduce one another.  This technique is no great mystery.  Between two adults or two teenagers it is usually called dating.  Years ago it was called courting."  <u>Grooming</u> at 12.  This is not specialized knowledge needed to assist the jury to determine a fact at issue.  As described by Lanning, "grooming" is simply the use of "attention, affection, kindness, privileges, recognition, gifts, drugs, or money" to lower another person's inhibitions.  <u>Id</u>.

 I conclude that even an "untrained layman," the ordinary jury member, is qualified to "determine intelligently and to the best possible degree" whether

a person has seduced a child, without enlightenment from Lanning.  Fed. R. Evid. 702 Adv. Comm. Notes.

With respect to victim credibility, Lanning says:  "Compliant child victims . . . often either deny their victimization or disclose it in inaccurate, but more socially acceptable ways because they suffer from shame, guilt, and embarrassment."  <u>Grooming</u> at 11.  In addition, he explains that the determination of victim credibility requires expert analysis (not just an education in general principles):

> In my experience, many valid claims of child sexual molestation, especially those by compliant child victims, involve the delayed disclosures, inconsistencies, varying accounts, exaggerations, and lies often associated with false allegations.  Inconsistencies in allegations are significant but can sometimes be explained by factors other than that the allegation is false.  What is consistent and logical in these circumstances must be based on experience and knowledge of cases similar to the case being evaluated.

<u>Grooming</u> at 30.  I address at the end of this opinion whether Lanning can testify in rebuttal to a defense claim that the victim's testimony is false for such reasons.  But I conclude here that his testimony cannot be used as affirmative proof of truthfulness.  "Often" and "many" don't do it for that purpose; and since Lanning will not interview any of the witnesses nor testify about the evidence in this case, he will be unable to show that his "experience and knowledge of cases" where such testimony was truthful is "similar to the case being evaluated" here.  Nor is it apparent why expert testimony is even

required, rather than eliciting from the victim testimony that she was embarrassed, and then letting the jury use its common sense.[14]

So, reviewing the various criteria for determining whether Lanning's expert opinion testimony about the behavioral patterns of child molesters and the testimonial characteristics of compliant victims is admissible at trial, I have the following. Lanning has decades of experience investigating child molesters, but for whether Lanning's facts and data are sufficient, all that I have is Lanning's *ipse dixit*. Having read his book and his article, I cannot assess his facts and data, and I cannot tell if he has used reliable methods and principles or unjustifiably extrapolated from an accepted premise in reaching his opinions. He is widely published, but I have no information on what kind of peer review his opinions have received outside of law enforcement investigation and child advocacy. I do not see that he has accounted for obvious alternative explanations of the behaviors he categorizes. I understand that his typology has been used by law enforcement, but I do not see that it has been tested or, indeed, that it can be. I have no idea what the error rate of his typology is, whether the error rate is reasonable, whether there are standards or controls for applying Lanning's opinions in a particular case, or the basis for a lay jury to apply them. Lanning developed his opinions independently of this litigation, but he developed them for law enforcement investigation purposes in pursuit of other evidence and *suspects*. I do not know whether Lanning's opinions are

---

[14] But see White v. Keane, 51 F. Supp. 2d 495, 502 (S.D.N.Y. 1999) (no error in state court admission of social worker's testimony about child sexual abuse syndrome and five emotional phases allegedly commonly associated with it (engagement, sexual interaction, secrecy, disclosure, and suppression)).

generally accepted in the community of psychologists and behavioral scientists for predicting illicit intent or victim truthfulness, and I do not know whether Lanning's professional field reaches reliable results beyond suggesting useful leads for law enforcement investigation.  I also have Lanning's insistence that his profiles should not be used to prove that someone is a child molester.  On "fit," I doubt that Lanning's testimony will add much to the jury's common sense.  If it does, then it carries the risk of unfair prejudice because of both its unproven reliability (except for use in police investigations searching for other evidence and possible suspects) and its addition of an expert's imprimatur to the government's theory of the case.  Given Lanning's statements about the difficulty of interpreting behavior when investigating suspects and evaluating witnesses and given that he will not specifically address the facts in this case, I conclude that the proposed testimony fails almost all the admissibility tests for allowing such testimony in a courtroom, as contrasted with a police investigation.

The government points out that several circuit courts (not the First) have affirmed the admissibility of Lanning's expert testimony.  Those circuit court decisions have given me substantial pause in reaching this contrary conclusion.  But I note first that, under the Supreme Court's decision in General Electric v. Joiner, circuit courts decide only whether trial courts have abused their discretion in admitting or excluding expert testimony.  522 U.S. at 146.  Therefore, an appellate court's finding of no abuse in *admitting* the evidence certainly does not suggest that there is any abuse in *excluding* it.  Nevertheless, I have examined the circuit opinions carefully.

20

Both Lanning and the government cite, first and foremost, <u>United States</u> <u>v. Romero</u>, in which the appeals court found that Lanning's "testimony was critical in dispelling from the jurors' minds the widely held stereotype of a child molester as 'a dirty old man in a wrinkled raincoat' who snatches children off the street as they wait for the school bus." 189 F.3d at 584. (The Seventh Circuit does not explain how it reached its conclusion that such was the widely held stereotype.)   Although <u>Romero</u> cites <u>Daubert</u>'s "nonexhaustive list of factors," it does not actually discuss Lanning's methodology. <u>Id</u>.[15] To be sure, not every <u>Daubert</u> factor applies in every case, but <u>Romero</u> does not disclose how Lanning's opinions satisfy *any* of the <u>Daubert</u> factors.[16]   <u>Id</u>.   Rather, <u>Romero</u> focuses on how Lanning's opinions can be useful in "explaining a complicated criminal methodology that may look innocent on the surface but is not as innocent as it appears." <u>Id</u>.[17]   But nowhere in the materials the government has presented to me here does Lanning say that child molesters as a group have adopted such a methodology.

The government also points to <u>United States v. Long</u>, 328 F.3d 655 (D.C. Cir. 2003), and <u>United States v. Hayward</u>, 359 F.3d 631 (3d Cir. 2004), to show that Lanning's testimony satisfies the requirements of Rule 702, but neither of

---

[15] The <u>Romero</u> trial court determined that "Lanning's testimony in general would be reliable," but the Seventh Circuit did not replicate the trial court's analyses.  <u>Romero</u>, 189 F.3d at 584.
[16] The Seventh Circuit noted that in <u>United States v. Cross</u>, 928 F.2d 1030 (11th Cir. 1991), the Eleventh Circuit had also found Lanning's testimony admissible.  <u>Romero</u>, 189 F.3d at 585. <u>Cross</u>, however, was decided before <u>Daubert</u> and did not directly address the reliability of Lanning's methodology.  The defendant in <u>Cross</u> also did not challenge Lanning's qualifications as an expert on pedophilia.  928 F.2d at 1049 n.63.
[17] Similarly, in <u>United States v. Davenport</u>, 149 Fed. Appx. 536 (7th Cir. 2005), the Seventh Circuit again held that Lanning's testimony was admissible under Rule 704, but it did so solely upon its <u>Romero</u> precedent and did not address the issue of reliability under <u>Daubert</u>.

those two cases actually involved a <u>Daubert</u> challenge.[18]  The <u>Long</u> court considered whether the lack of statistical analysis supporting Lanning's opinions rendered his testimony unduly prejudicial under Rule 403 (it said no), but specifically noted that there was no <u>Daubert</u> challenge.  See <u>Long</u>, 328 F.3d at 668.  In <u>Hayward</u>, the Third Circuit considered a challenge to Lanning's testimony under Rule 704(b) but did not discuss the reliability of the principles and methods that Lanning used to develop his testimony about the behavioral "patterns exhibited by many acquaintance child molesters."  See <u>Hayward</u>, 359 F.3d at 635-37.[19]

Some appellate decisions, recognizing that profile evidence is generally objectionable,[20] characterize Lanning's testimony not as profile testimony but

---

[18] To the extent that the <u>Hayward</u> court considered Rule 702, it focused on Lanning's qualifications as an expert based on his experience at the FBI.  See <u>Hayward</u>, 359 F.3d at 636 & n.7. With respect, that is hardly sufficient to satisfy the <u>Daubert</u> criteria.

[19] In <u>Forrest</u>, the Fourth Circuit found that the admission of Lanning's testimony about a "general profile of a serial child molester that closely resembled [a defendant's] behavior" was "troubling," but it held that any error in admitting the evidence was harmless and therefore avoided the question whether Lanning's testimony could satisfy Rule 702.  <u>Forrest</u>, 429 F.3d at 81.  In <u>United States v. Fitzgerald</u>, the Fourth Circuit upheld the exclusion of a psychologist's testimony about the methodology and behavior of child molesters "to assist in proving . . . intent to molest the alleged victims."  80 Fed. Appx. 857, 861 (4th Cir. 2003).  The court found insufficient evidence of testing, peer review, error rate, standards and controls, or general acceptance.  <u>Id</u>. at 861-62.  In <u>Gier v. Educational Service Unit. No. 16</u>, 66 F.3d 940 (8th Cir. 1995), the court upheld exclusion, on <u>Daubert</u> grounds, of psychologists' testimony that children had been abused.  The district court found that the instrument (Child Behavior Checklists) had not been validated for use with mentally retarded children; that it was insufficient on its own to establish abuse; that the interview protocol did not provide specific guidance for the clinical interviews; and that the experts departed significantly from the clinical protocol.  <u>Gier</u>, 66 F.3d at 944.  The appeals court upheld exclusion of the expert testimony on the ground that even if the methodology was reliable, it was reliable only to choose a course of psychotherapy, not to make factual or investigative conclusions in legal proceedings.  <u>Id</u>. (citation omitted).

[20] In <u>United States v. Gillespie</u>, for example, the Ninth Circuit considered the admissibility of a clinical psychologist's testimony about the common characteristics of child molesters that the government offered "to rebut . . . the [defendant's] testimony he could not have molested [a] child."  852 F.2d at 480.  The psychologist testified not about behaviors but about the typical background of a child molester, including "an early disruption in the family environment, often with one parent missing: a relationship with the parent of the opposite sex who is dominant; *(continued next page)*

as permissible modus operandi testimony.[21]   Some courts say that just as drug enforcement agents can testify about the modus operandi of drug dealers, Lanning can testify about the modus operandi of adults who molest children. See Romero 189 F.3d at 584-85.   It is common, for example, in drug trafficking cases to permit law enforcement agents to characterize written notations as drug transaction ledgers, interpret innocent-sounding words on a telephone call as referring to particular drugs, describe how drugs are packaged, etc.[22]   The behavior described by Lanning, however, is significantly different.   Lanning does not say anywhere that there is a culture of child molestation or a set of practices and protocols that child molesters learn from other child molesters in the way that drug dealers adopt certain practices in the business of the drug trade.[23]   Lanning does not purport to have documented a specialized body of

---

unsuccessful relationships with women; a poor self-concept; and general instability in the background."   Id.   The Ninth Circuit held that the "trial court's admission of the testimony was an abuse of discretion [because] [n]either the [defendant], his witnesses, nor his lawyer put his general character at issue or testified he had any specific character traits that rendered him incapable of molesting a female child."   Id.   The court also noted that "testimony [about] criminal profiles is highly undesirable as substantive evidence because it is of low probativity and inherently prejudicial."   Id.

[21] In upholding the admissibility of Lanning's testimony, the Eleventh Circuit distinguished the Gillespie testimony about "the typical child molester's family background" as objectionable profile testimony, explaining that, in contrast, testimony about how certain crimes are committed (modus operandi evidence) can be used to "explain the actions of [a] defendant[]." Cross, 928 F.2d at 1050-51 & n.66 (citations omitted).

[22] I note that in the First Circuit drug agent testimony about drug dealers' practices is not even considered expert opinion testimony but rather lay opinion testimony.   United States v. Page, 521 F.3d 101, 105 (1st Cir. 2008) (citing United States v. Ayala-Pizarro, 407 F.3d 25, 28 (1st Cir. 2005)).   The principle behind the First Circuit's approach to testimony about the practices of drug dealers is that lay witnesses may "express opinions about a business based on the witness's own perceptions and 'knowledge' and participation in the day-to-day affairs of [the] business."   United States v. Munoz-Franco, 487 F.3d 25, 35 (1st Cir. 2007) (citations omitted). Here, Lanning is not proposing to testify about a business that he has observed.   Instead, he purports to have conducted a behavioral analysis of child molesters, and the government has appropriately recognized that it must therefore meet the standards of Rule 702.

[23] Although illegal, drug distribution is a commercial activity, and its participants necessarily develop common terminology and practices, just as Section 1-205 of the Uniform Commercial Code recognizes for legal commercial activity.   As the Advisory Committee Note says, "when a
*(continued next page)*

knowledge that child molesters use.  Instead, what Lanning does is predict individual intent (or encourage juries to do so) from patterns of isolated individual behavior that he has catalogued and categorized, many of which may be indistinguishable from normal social behavior.  It is a huge jump from descriptively categorizing behaviors to predicting intent from those behaviors, a jump that has not been justified on this record.

Let me be clear.  I do *not* say that Lanning's conclusions are incorrect or that the phenomena he describes do *not* exist.  His curriculum vitae shows that he has had a long and distinguished career in law enforcement.   His investigations, research, "descriptive typologies," and publications have obviously performed a great service for child advocates and for law enforcement in the search for offenders and for the evidence that then will support a prosecution.  But here, the search is not for *suspects*, but for proof of guilt or its absence.   I simply have not been shown that, *for reaching factual conclusions in court about a person's intent or truthfulness based upon behavior patterns, rather than for suggesting investigative leads*, Lanning's opinions are based upon sufficient facts or data, or that they are the product of reliable principles and methods.  Neither he nor the government even purports to apply

---

law enforcement agent testifies regarding user code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of activities.   The method used by the agent is the application of extensive experience to analyze the meaning of the conversations.  So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted."  Fed. R. Evid. Adv. Comm. Notes.  The same may be true of other criminal business enterprises, such as prostitution, <u>see</u> Long, 328 F.3d at 666 (citing <u>United States v. Watson</u>, 171 F.3d 695, 703 (D.C. Cir. 1999) and collecting cases), or gambling operations and terminology, <u>see</u> <u>United States v. White</u>, 890 F.2d 1012, 1014 (8th Cir. 1989) (citing <u>United States v. Scavo</u>, 593 F.2d 837, 844 (8th Cir. 1979)).

the principles and methods reliably to the facts of this case, and I conclude that these are not the sort of general principles where a jury can use its common sense in determining how to apply them.  It is the failure to meet those standards of Rule 702 that leads me to exclude his testimony.  Perhaps Lanning could show acceptable data, demonstrate how his principles derive from that data, and show me that peer review (outside law enforcement investigation focused on suspects) supports him.  But the government has not provided me that information here and, from reading the other cases that involve his testimony, I see no sign that it exists.[24]

I do leave open the question whether the government could call Lanning on rebuttal to counter a defense case that victim testimony in this case should not be believed because the victim delayed in reporting the abuse or did not report it consistently.[25]   An expert cannot simply vouch for a child victim's truthfulness, United States v. Shay, 57 F.3d 126, 131 (1st Cir. 1995), but conceivably the government could have Lanning testify about documented

---

[24] In United States v. Thomas, 2006 U.S. Dist. LEXIS 3266 (D. Md. Jan. 13, 2006), the testimony of James Clemente, Lanning's successor at the FBI, was excluded as unreliable under Rule 702.  "Clemente admitted that the typology of a preferential sex offender, which is the essential predicate to his risk assessment methodology, as well as re-offense risk assessment regarding such offenders, requires additional research to achieve validation . . . [and] therefore acknowledged that his opinions were based on anecdotal case studies and interviews, albeit 'a huge amount', and lacked an empirical basis."  Id. at *74.  Notably, while Clemente testified that the "typology of a preferential sex offender has been referenced in a number of publications outside the field of criminal investigative analysis, no studies or publications were offered in which . . . other criminal investigative analysts, analyzed or validated the typology." Id. at *77.

[25] I will not allow rebuttal testimony on "grooming" and "nice guy" offenders in rebuttal to defense arguments that Raymond's behavior shows innocence.  The Rule 403 prejudice is too grave, namely, that the jury would conclude from Lanning's testimony not just that Raymond's behavior could be consistent with guilt (a matter of common sense), but that Raymond's behavior actually demonstrates guilty grooming behavior, a conclusion whose reliability I have concluded has not been established.  Although it is a close call, at this time, I am not prepared to say that the same unfair prejudice occurs if Lanning should testify in rebuttal that some victims who reveal abuse late or inconsistently turn out to be truthful about the abuse.

incidents in his experience where victims have, in fact, been telling the truth, and yet because of embarrassment or fear, did not always make consistent statements, and thereby rebut defendant arguments that this victim was necessarily untruthful.[26]   But at this point, the government has not provided the data or information required by Rule 702 and Federal Rule of Criminal Procedure 16 to support that kind of testimony (if it is expert testimony, an issue that the parties have not raised).   If the government does want to offer such testimony on rebuttal, it will have to provide a clear showing of a sufficient foundation for it.

CONCLUSION

For these reasons, the defendant's motion was **GRANTED** on March 14, 2010, subject to the reservation of rebuttal testimony.

**SO ORDERED.**

**DATED THIS 2ND DAY OF APRIL, 2010**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[26] But see United States v. Bighead, 128 F.3d 1329, 1336-39 (9th Cir. 1997) (Noonan, J., dissenting) (arguing reversible error to allow expert to testify on rebuttal about general aspects of reporting incidents of child sexual abuse where expert had reached no conclusion about whether the children actually had been abused).